**Thomas G. LOVETT, Trustee of the Bankruptcy Estate of John Peterson Motors, Inc.; Donald John Peterson, individually, Appellees,**

v.

**GENERAL MOTORS CORPORATION, Appellant.**

**No. 91–2647MN.**

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1992.

Decided July 9, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 9, 1993.

See also 975 F.2d 518.

William B. Slowey, Detroit, MI, argued (James S. Simonson, Richard G. Braman and Quentin R. Wittrock, Minneapolis, MN, Steven J. Cernak, Detroit, MI, on the brief), for appellant.

John A. Cochrane, St. Paul, MN, argued (Stewart C. Loper and Patrick C. Smith, on the brief), for appellees.

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

FAGG, Circuit Judge.

Thomas G. Lovett, trustee of the bankruptcy estate of John Peterson Motors, Inc. (JPMI), and Donald John Peterson, JPMI's owner and operator, prevailed at trial in this antitrust action against General Motors Corporation (GM). A jury found that GM violated section one of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988) (prohibiting conspiracies in restraint of trade), and awarded JPMI $986,000 in damages, which the district court automatically trebled to $2,958,000, *see id.* § 15. The jury also awarded damages to Peterson individually. GM then moved for judgment as a matter of law (JAML). The district court granted the motion with respect to Peterson, but denied the motion with respect to JPMI. *Lovett v. General Motors Corp.,* 769 F.Supp. 1506, 1522 (D.Minn.1991). We have already decided Peterson's appeal, *Lovett v. General Motors Corp.,* 975 F.2d 518 (8th Cir.1992), and now consider GM's ap-

peal. We reverse the denial of JAML to GM.

GM markets Buick, Cadillac, Chevrolet, Oldsmobile, and Pontiac vehicles through more than ten thousand dealers. The dealer network is GM's only means to sell its products and to provide presale, point-of-sale, and postsale services to consumers. GM analyzes its dealer network to ensure it has the correct number of properly located dealers of the appropriate size so that GM can provide customers with a convenient arrangement of dealerships and can successfully compete with other auto makers.

Dealer Sales and Service Agreements govern the relationship between GM and each of its dealers. Under the agreements, GM assigns dealers an area of primary responsibility (APR) for the purpose of evaluating performance. Dealers agree to sell and service the product lines effectively and to promote new vehicle sales in their APR's through their own advertising and sales promotions. Dealers must maintain an adequate sales force and provide presale information to consumers. Dealers can sell to any customer, located anywhere, at any price, but must service GM vehicles regardless of where they were purchased. For its part, GM agrees to distribute vehicles in a fair and equitable manner and to explain its distribution method to dealers. GM has final discretion in accepting orders and distributing vehicles. One factor that affects distribution is sales potential in a dealer's APR.

In late 1980, JPMI entered into five-year Sales and Service Agreements with GM's five divisions. JPMI's dealership was located in Lake City, Minnesota, approximately seventy miles from the Twin Cities. JPMI's APR did not include the Twin Cities. According to GM guidelines, JPMI's facility could support servicing between 200 and 250 new car sales annually. From late October 1980 until late February 1983, JPMI operated as a conventional dealer selling motor vehicles from purchased inventory for individually negotiated selling prices, i.e., the manufacturer's suggested retail price (sticker price) less a particular amount negotiated with each buyer. On February 28, 1983, JPMI began marketing all vehicles at $49 over factory invoice.

Under this program, JPMI disclosed the factory invoice amount to any potential customer, then added $49 to that price. JPMI reduced the number of cars kept on the lot at the dealership and began operating primarily on a "sold order" basis, meaning customers would purchase new vehicles that GM had not yet made, then JPMI would order the vehicle. When JPMI implemented the program, JPMI began advertising in Twin Cities newspapers. The advertisements encouraged buyers to order cars over the telephone or by mail.

JPMI's new marketing strategy increased its sales to more than 700 vehicles in 1983 and more than 1000 vehicles in 1984, but JPMI's service business did not grow proportionately. Due to JPMI's lower prices and distant location, GM customers in the Twin Cities area often placed their new car orders with JPMI over the telephone or by mail. Predictably, lost sales bothered Twin Cities dealers, who complained to GM about JPMI's $49 over factory invoice program. Dealer associations and individual dealers complained that JPMI's program was detracting business from the Twin Cities area and reducing their profits by about $300 per vehicle. They asked GM to take strong action to eliminate JPMI's program. GM did not respond to the complaints, solicit the views of the dealers or associations, or consult with them. GM filled JPMI's new Buick orders until February 1984, when GM began to restrict JPMI's allocation of vehicles. GM decided to reduce JPMI's allocation after discussing alternative strategies during in-house deliberations. In March 1984, GM formally notified JPMI that Buick would not be able to fill as many of JPMI's orders as in the past, and JPMI should reconsider its marketing strategy. GM did not inform the dealers or dealer associations of its decision. Soon after GM restricted JPMI's car supply, JPMI filed for bankruptcy.

At trial, Lovett contended various Twin Cities GM dealers and GM conspired to reduce JPMI's allocation of vehicles to lessen price competition in the Twin Cities area. In other words, Lovett contended GM used decreased supply as a lever to force JPMI to stop selling vehicles at $49 over factory in-

voice and to stabilize prices at their earlier higher levels (about $300 over factory invoice). The jury found that "[GM] [d]ealers, in an attempt to substantially restrain price competition, conspire[d] to induce [GM], or one of its divisions, to reduce the allocation of automobiles to [JPMI]" and that GM knowingly became a member of the conspiracy.

■ GM asserts the district court should have granted its motion for JAML because Lovett did not show GM joined any dealer conspiracy. To establish a violation of 15 U.S.C. § 1, Lovett had to show there was a conspiracy between GM and its dealers. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Because there is no direct evidence of conspiracy in this case, we must decide whether a reasonable juror could infer the existence of a conspiracy from the circumstantial evidence. Although we view the evidence and all reasonable inferences in the light most favorable to Lovett when reviewing the district court's denial of JAML, *McCabe's Furniture, Inc. v. La–Z–Boy Chair Co.*, 798 F.2d 323, 327 (8th Cir. 1986), the range of permissible inferences from ambiguous evidence is limited in a section one case, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Section one does not prohibit a manufacturer from taking independent action against a dealer. *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469. This is so because a manufacturer may have its own valid business reasons for taking the adverse action. A manufacturer often wants to ensure its dealers earn enough profit to pay for services and promotional activities that are necessary to market the manufacturer's product efficiently. *Id.* at 762–63, 104 S.Ct. at 1470; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977). Manufacturers also have an interest in preventing "free riding." *Monsanto*, 465 U.S. at 762–63, 104 S.Ct. at 1470; *see Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560. A free rider problem may arise when a manufacturer's dealers offer presale, point-of-sale, or postsale services. *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195 n. 8 (6th Cir.1982). Price-cutting dealers are often able to sell at lower prices by avoiding the cost of providing these services. *Id.* Consumers can take advantage of the services provided by dealers who do not cut their prices, but purchase the product from the price-cutting dealer. *Id.* Thus, the dealers who do not cut their prices perform essential services without benefitting from sales. *Id.* Free riding is a great concern in the automobile industry because service and repair are vital. *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560. The availability and quality of service and repair affect a manufacturer's goodwill and the competitiveness of the manufacturer's product. *Id.* Accordingly, a manufacturer can take action against a price-cutting dealer without fear of antitrust liability if the action is the product of the manufacturer's independent decision that the price-cutting dealer undermines the well-being of the manufacturer's dealer network, *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1533 (11th Cir.1987), even though the manufacturer learns about the price-cutting dealer's behavior from dealers "whose principal or perhaps only concern is with protecting their prices," *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1440 (7th Cir.1986).

■ Because a fine line separates unlawful concerted action from legitimate business practices, an antitrust conspiracy cannot be inferred from "highly ambiguous evidence." *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470. Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. Thus, evidence that a manufacturer took adverse action against a dealer following, or in response to, price-related complaints from other dealers is not enough to support an inference of conspiracy. *Monsanto*, 465 U.S. at 763–64, 104 S.Ct. at 1470. Instead, the price-cutting dealer must present additional evidence tending to exclude the possibility that the manufacturer took the adverse action independently. *Id.* at 764, 104 S.Ct. at 1471; *see Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. "[D]irect or circumstantial

evidence that reasonably tends to prove that the manufacturer and [complaining dealers] had a conscious commitment to a common scheme designed to achieve an unlawful objective" excludes the possibility of independent action. *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473. An inference of conspiracy must be "reasonable in light of the competing inferences of independent action." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356.

■ The district court concluded Lovett produced enough additional evidence from which a reasonable jury could find GM did not act independently. 769 F.Supp. at 1511–13. We believe the district court failed to recognize that Lovett's evidence is as consistent with permissible unilateral conduct on GM's part as it is with illegal conspiracy, and that *Monsanto* does not permit a jury to infer the existence of a conspiracy from ambiguous evidence. We conclude an inference of conspiracy is unreasonable in view of the strong competing inference that GM acted independently to preserve its distribution system.

After learning of JPMI's $49 over factory invoice program from local newspapers in late February 1983, GM representatives began to scrutinize JPMI's sold car orders. GM became concerned when JPMI's sold orders increased substantially. An Oldsmobile zone manager, Kruger, visited JPMI in late April 1983 and told Peterson that the new marketing program might "breed more car orders than [Kruger] could possibly cover under a good equitable distribution system." Kruger got angry and expressed opposition to the program. The Cadillac zone manager, Grogg, also visited JPMI. Grogg told Peterson that the availability of Cadillacs was limited and Peterson should keep his orders within existing guideline figures. Grogg also informed Peterson the Twin Cities Cadillac dealers were very upset and JPMI should stop its program.

In September 1983, Walser, the president of the Twin Cities Buick dealers' association and a large Twin Cities Buick dealership, called the Buick zone manager, Pirtle, and asked Buick to take strong action to stop JPMI's program for the association. Pirtle stated he would not discuss JPMI with Walser or the association. Walser also may have made his complaints known to GM executives during a social gathering at about the same time.

In October 1983, GM circulated an internal memo listing several alternative strategies for dealing with the $49 over factory invoice marketing program, which about 20 GM dealers were using nationwide. One suggested strategy was to limit vehicle allocations based on some measure of market potential in the dealer's APR. The following month, GM conducted conference calls among its own marketing staff, divisional sales personnel, and lawyers about the $49 over factory invoice program. GM discussed the program during more internal conference calls in January 1984, and eventually decided to restrict vehicle allocation. In February 1984, GM set the cutback of JPMI's vehicles in motion. No GM dealers or dealer associations were involved in GM's deliberations.

On February 8, 1984, a Buick district manager, Picker, wrote a memorandum to his supervisor, Buick zone manager Pirtle, reporting dealer complaints about the $49 over factory invoice program. Picker reported that JPMI's program was having an adverse effect on the profits of Twin Cities dealers and threatened to undermine the operation of dealerships designed to promote customer satisfaction. On February 15, 1984, GM's attorneys and division managers met in Minneapolis to make sure all GM divisions administered GM policy to JPMI uniformly.

On March 6, 1984, Walser telephoned Pirtle and stated that Walser was resigning from the Twin Cities Buick Dealer Advertising Association because of Buick's reluctance to address the problem of JPMI's program. Pirtle received a letter from Walser on March 15, 1984 confirming his conversation on March 6. The letter stated that Twin Cities dealers had to reduce their gross profits substantially in order to compete with JPMI, and complained about having to service cars sold by JPMI. In the letter, Walser also said he found GM's "refusal to discuss the matter totally frustrating."

On March 9, 1984, Pirtle received a memo from Buick's director of car distribution stat-

ing that Buick could not distribute cars to JPMI based on sold orders only and, at the same time, maintain a fair and equitable distribution for all Buick dealers in the zone. The memo ordered Pirtle to bring preferencing (method of giving priority to dealers' car orders for production) in line with Buick's distribution system and sales potential in JPMI's APR. On March 14, 1984, Pirtle wrote Peterson a letter stating that because the supply of Buicks was decreasing, Buick would "no longer be able to fill as great a percentage of [JPMI's] orders as ... in the recent past." Pirtle stated JPMI would still receive enough Buicks to fulfill its sales responsibilities in its APR plus any extra vehicles for which demand did not exceed supply. In April 1984, an internal GM memo stated GM's overriding consideration in distributing cars to JPMI was the dealership's planning potential.

Two JPMI customers testified about their experiences with GM and Twin Cities GM dealers. Salespersons at Twin Cities dealerships told an impatient JPMI customer, Brooks, that he could get the car he had ordered in August 1983 more quickly if he purchased the car from them at sticker price. One of the salespersons stated, "[W]e've gotten together with the area's coop[erative dealers association] and GM and we're going to run that $49 over place out of business." Brooks wrote a letter to GM reporting his experience and the statement. Johnson, a customer who ordered a new Buick from JPMI in April 1984, sought to purchase a car from two Twin Cities dealers after waiting nine weeks for delivery. In the fall of 1984, both Twin Cities dealers told Johnson they could obtain the car he wanted in four to six weeks if he was willing to pay at or near the sticker price. Johnson also called GM to find out why JPMI had not received his car. A GM employee told Johnson that JPMI had not preferenced his car. When confronted with this statement's falsity, the GM employee told Johnson, "[Y]ou know what is happening."

In our view, Lovett's evidence is ambiguous. The evidence relating to Kruger and Grogg visiting JPMI shows nothing more than alert GM division managers addressing a potential distribution problem. As for Grogg's statement that JPMI should stop its program, Peterson admitted he did not know whether Grogg was speaking for GM or for the Cadillac dealers' association. Thus, Grogg's statement does not help JPMI prove GM joined the alleged conspiracy. Walser's letter to GM in March 1984 makes clear that no one at GM had ever discussed JPMI with him, and that he had no inkling GM had already cut back JPMI's supply. Because GM had already cut JPMI's supply when Walser wrote the letter, the letter is not coercive and actually suggests GM acted alone. The failure of the Walser evidence is significant because Lovett portrays Walser as a major player in the alleged conspiracy. Further, GM's internal memoranda and discussions are consistent with GM addressing an impending threat to its dealer network. Complaining dealers were not present during GM's meetings, and there is no evidence that the dealers threatened to terminate their dealerships with GM to coerce GM's actions. GM steadfastly refused to discuss JPMI with other GM dealers or associations in response to their complaints, or to meet with dealers or dealer associations. GM did not invite dealers to their meetings or ask for their input in GM's internal deliberations, and did not even inform the dealers after GM restricted JPMI's vehicle allocation. GM's internal deliberations are consistent with GM independently evaluating alternative ways to deal with the price-cutting dealers and independently deciding to restrict JPMI's allocation. As for the customer related evidence, the Brooks letter was not admitted to show its truth and the incident took place before GM allegedly joined the conspiracy or cut back JPMI's car supply. The Johnson incident happened after GM had already restricted JPMI's allocation. Thus, the GM employee's statement was ambiguous. Although GM was less than honest with JPMI while it was deciding to cut JPMI's allocation, this does not show GM was not acting alone.

We agree with GM that the evidence is as consistent with GM taking independent action to preserve its distribution system as with conspiracy. JPMI threatened GM's dealer network as a free rider. Although

JPMI had trained salespersons who provided presale and point-of-sale services and a service department that provided postsale services, JPMI's price-cutting strategy allowed it to avoid an increase in these overhead costs proportionate to its increase in sales. Because some Twin Cities customers apparently browsed at Twin Cities dealerships to select a model, then placed their car order with JPMI over the telephone or by mail, JPMI avoided many presale and point-of-sale costs. JPMI also avoided the cost of maintaining a larger postsale service department to repair all the vehicles it sold because the Twin Cities customers would take their vehicles to local dealers, who were required by their dealer agreements to service GM vehicles sold elsewhere. Twin Cities dealers were compensated for postsale services, but the quality of services provided by these dealers would eventually decrease with the profitability of their dealerships. Thus, GM's legitimate business goals of quality service and customer satisfaction would ultimately be defeated.

We believe the jury's finding of a conspiracy in this case shows why cases arising under section 1 of the Sherman Act and based on highly ambiguous evidence should not be submitted to a jury. As the Supreme Court has explained, it is "extremely difficult for the manufacturer to convince a jury that its motivation [in taking action against a price-cutting dealer] was to ensure adequate services, since price cutting and some measure of service cutting usually go hand in hand." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 727–28, 108 S.Ct. 1515, 1521, 99 L.Ed.2d 808 (1988).

Lovett did not carry his burden to produce evidence tending to exclude the possibility that GM acted independently of its dealers when it restricted JPMI's allocation of vehicles. Because the evidence is as consistent with permissible unilateral conduct as with illegal conspiracy, the evidence is insufficient to support the alleged antitrust conspiracy. Accordingly, we reverse the district court's order denying GM's motion for JAML.