**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-4208

_____

The Corner Pocket of Sioux Falls, Inc.,                    *
et al.,                                        *
                                              *
    Plaintiffs - Appellants,   *    Appeal from the United
States
                                              * District Court for the
    v.                         * District of South Dakota.
                                              *
Video Lottery Technologies, Inc., et al.,                 *
                                              *
    Defendants - Appellees.    *

_____

                        Submitted:   June 9, 1997
                            Filed:   August 29, 1997

_____

Before  LOKEN  and  ROSS,  Circuit  Judges,  and  FENNER,[*]
    District Judge.

_____

LOKEN, Circuit Judge.

    In 1989, the State of South Dakota initiated a video
lottery regulated by the South Dakota Lottery Commission.
See S.D. CODIFIED LAWS Ch. 42-7A.  In this type of lottery,
games of chance are played on coin-operated, computer-
controlled video machines.  The video lottery machines are
privately owned, but the State owns the

_____

[*]The HONORABLE GARY A. FENNER, United States District Judge for
the    Western District of Missouri, sitting by designation.

operating software and controls the games through a central computer system.  The machines repay players 80-95% of the amounts wagered.  The State takes a portion of the remaining gross revenues (initially 22%, now 50%) by electronically sweeping the machine owner's bank account.  See generally Chance Mgmt., Inc. v. State of South Dakota, 97 F.3d 1107, 1108 (8th Cir. 1996), cert. denied, 117 S. Ct. 1083 (1997); Poppen v. Walker, 520 N.W.2d 238, 249 (S.D. 1994).

In November 1993, the Lottery Commission investigated the video lottery machine market and concluded there was effective competition.  Plaintiffs nonetheless commenced this antitrust class action in June 1994, alleging that Video Lottery Technologies, Inc. ("VLT"), manufacturer of the most popular video lottery machines, had refused to sell its machines to new customers for the purpose of enforcing a conspiracy among vending machine distributors to allocate territories and fix prices, all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Following discovery, the district court[1] granted summary judgment for defendants on the ground that plaintiffs had failed to present sufficient evidence of an unlawful conspiracy.  Plaintiffs appeal, launching a three-pronged attack on the district court's decision.  We affirm.

**A.**  Plaintiffs first argue that the district court erred in applying the legal standard for granting summary judgment in antitrust cases.  Plaintiffs criticize the court's "heavy reliance" on Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986), where the Supreme Court stated that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference

---

[1]The HONORABLE RICHARD H. BATTEY, Chief Judge of the United States District Court for the District of South Dakota.

of antitrust conspiracy."  Relying primarily on cases from the Third and Ninth Circuits, plaintiffs argue that this portion of <u>Matsushita</u> does not apply to this case because the conspiracy they allege served defendants' economic interests.  However, we are among the majority of courts and commentators who read <u>Matsushita</u> more broadly.  <u>See</u>

Lovett v. General Motors Corp., 998 F.2d 575, 578-79 (8th Cir. 1993), cert. denied, 510 U.S. 1113 (1994); City of Mt. Pleasant, Iowa v. Associated Elec. Co-op, Inc., 838 F.2d 268, 273 (8th Cir. 1988); II AREEDA AND HOVENKAMP, ANTITRUST LAW ¶ 322, at 70-72, 75-81 (rev. ed. 1995). In its Memorandum Opinion and Order, the district court discussed at length the appropriate summary judgment standard in complex antitrust cases, carefully reviewing these relevant cases. We conclude that the court properly articulated and applied the governing summary judgment standard of this Circuit.

**B.** Plaintiffs next argue that the district court engaged in improper summary judgment fact-finding when it accepted defendants' explanations for market conditions that, in plaintiffs' view, evidence an unlawful conspiracy. To put this issue in context, we must briefly describe the South Dakota video lottery machine market.

The private sector participants in the South Dakota video lottery are defined by statute. The State separately licenses video lottery machine manufacturers and distributors, who manufacture and sell the machines; "operators," who own the machines and account to the State for their revenues; and gambling "establishments," where the machines are played by consumers of this government-sponsored gambling. See S.D. CODIFIED LAWS §§ 42-7A-1(15-17), 41-45. Licensed manufacturers and distributors must sell their machines to licensed operators, who typically lease the machines to licensed establishments. Only bars, restaurants, and inns that sell alcoholic beverages may become licensed

-4-

establishments.  Operators and establishments negotiate their respective shares of the machine revenues remaining after the State takes its cut.  Typically, those shares are stated as a percentage "split," such as 50-50.

The South Dakota video lottery commenced in October 1989.  By the end of 1989, six manufacturers were licensed to sell video lottery machines approved by the State.  Not surprisingly, those best prepared to distribute these machines were the established distributors of coin-operated vending machines, businesses that for years

had placed juke boxes, pool tables, pinball machines, and dart boards in bars and restaurants around the State. These distributors and their trade association, the Music and Vending Association ("MVA"), had successfully lobbied the Legislature to authorize a video lottery. When the lottery began, MVA members had obtained operator licenses and were ready to supply video lottery machines to licensed establishments located on the operators' well-established vending machine routes.

As the lottery got underway, something unanticipated occurred -- South Dakota gamblers overwhelmingly preferred to play video lottery machines manufactured by VLT. But these popular machines proved hard to get. Beginning as early as the fall of 1989, newly-established operators, including licensed establishments that obtained operator licenses so they could buy their own machines, had difficulty buying machines from VLT. To outsiders, it appeared that VLT was refusing to deal with anyone other than well-established vending machine distributors and those "squeaky wheels" who threatened litigation or complained to the Lottery Commission. Though VLT denied such an exclusionary policy and the Lottery Commission's investigation concluded that the marketplace was sufficiently competitive, the named plaintiffs -- two licensed operators and three licensed establishments -- smelled an unlawful conspiracy and began this action against VLT, certain licensed operators who are long-standing vending machine distributors, and the MVA.

Plaintiffs' Allegations. Although the lawsuit was initially prompted by VLT's refusal to sell video lottery

machines to plaintiffs and others from the fall of 1989 to late 1993, plaintiffs' antitrust claims evolved through discovery and the summary judgment process to include the following allegations:

-- MVA and the operator defendants conspired to allocate operator territories in South Dakota. MVA members have their own distribution routes and went to great lengths to avoid competing in each other's territories. For example, MVA member

protocol is to refer a competitor's complaining customer to that competitor, rather than try to obtain the account.

-- MVA and the operator defendants conspired to fix prices by agreeing to make video lottery machines available to establishments for a 50-50 split of the net revenues. In 1989, one MVA member circulated a sample lease agreement showing a 60-40 split. The operator defendants then agreed to adopt the 50-50 split, which was reflected in over 80% of their contracts with establishments between 1989 and 1993. When the conspiracy broke down,[2] the operators' share of negotiated splits decreased.

-- VLT knowingly enforced the operator conspiracy by refusing to sell its video lottery machines directly to establishments, or to licensed operators other than the operator conspirators. VLT's policy of not selling machines to operators who leased to establishments at 90-10 or 80-20 splits helped enforce the cartel's conspiracy to impose 50-50 splits on establishments. VLT assumed the role of cartel enforcer out of gratitude for help MVA members gave VLT in quickly obtaining a South Dakota manufacturer license, and out of fear that MVA would otherwise use its influence to tarnish VLT's reputation

---

[2]Paradoxically, plaintiffs allege that the conspiracy broke down as a result of the Lottery Commission's investigation but argue that the Commission's report -- which found the video lottery machine marketplace competitive -- should be ignored as irrelevant. In our view, the heavily regulated nature of this business is highly relevant in determining whether "the inference of conspiracy is reasonable in light of the competing inferences of independent action." Matsushita, 475 U.S. at 588.

-8-

in other States.

   Defendants' Response.   In moving for summary judgment, defendants painted a very different picture of the video lottery machine market than plaintiffs' conspiracy-dominated portrait:

-- When the video lottery began, long-time vending machine distributors had well-defined territories or routes, typically encompassing the area in which customer machines can be serviced in one day's drive. These operators concentrated on placing the new video lottery machines with existing bar, restaurant, and hotel customers in their traditional territories. When supplies of the popular VLT machines became limited, operators served their existing customers first. There was no agreement to allocate territories or customers. Many MVA members have overlapping routes, and plaintiffs have no evidence describing defendants' behavior along route overlaps, where one might reasonably expect to find competition absent a conspiracy.

-- The 50-50 revenue split was common in the coin-operated vending machine industry long before the video lottery. When the lottery was new and its prospects uncertain, licensed operators and establishments reasonably adopted this equitable-looking split; indeed, the named plaintiffs and other non-MVA operators did so. When the initial leases expired, operators and establishments renegotiated based upon actual experience with VLT machines. Establishments with profitable machines demanded and received more generous splits. Thus, the increase in split variety (pricing diversity), which plaintiffs attribute to the conspiracy breaking down, is entirely consistent with what would have happened in a competitive marketplace.

-- VLT was not the enforcer for an operator cartel. Throughout the alleged conspiracy, VLT sold machines to non-MVA members, to new entrants in the operator market,

and occasionally to establishments that obtained operator licenses and could lawfully buy machines. VLT's refusals to deal are explained by factors other than the alleged conspiracy.  First, VLT's sales policy, which predated its entry into the South Dakota market, was to sell machines to vending machine distributors, not retail establishments.  VLT markets to distributors because it believes that well-serviced machines will be more popular and generate more revenues, because in VLT's experience bars and restaurants do not properly service machines, and because VLT does not wish to perform the service function.  VLT prefers well-established

distributors experienced in servicing machines.  This policy explains many of VLT's refusals to deal during the alleged conspiracy period, including its refusal to sell to operators who leased machines at 90-10 or 80-20 splits, terms that VLT considered tantamount to resale. A manufacturer may refuse to deal for these reasons, so long as it does so independently.  See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984); Weather Wise Co. v. Aeroquip Corp., 468 F.2d 716, 718 (5th Cir. 1972), cert. denied, 410 U.S. 990 (1973).  Second, the immediate success of VLT's machines in South Dakota meant that VLT received many more orders than it could fill.  In the 1989-1992 period, virtually all buyers encountered back order delays.  When forced to prioritize, VLT understandably favored its best customers -- well-established vending machine distributors -- and other prospective buyers who threatened litigation or complained to the Lottery Commission.  Thus, as the Lottery Commission concluded, factors other than the alleged conspiracy explain why plaintiffs encountered difficulty in obtaining VLT machines.

In granting summary judgment to defendants, the district court concluded that VLT had rationally explained its policy of selling only to selected operators, that the prevalence of 50-50 splits was non-actionable conscious parallelism by the defendant operators, and that the operators' practice of staying within their well-established service routes did not evidence an agreement to allocate territories. Plaintiffs contend the court usurped the jury's function by inferring lawful conduct from defendants' descriptions of the marketplace.  We disagree.  Because "antitrust law

limits the range of permissible inferences from ambiguous evidence in a § 1 case," the court must necessarily weigh the summary judgment evidence of both parties in determining whether plaintiffs' evidence "tends to exclude the possibility that the alleged conspirators acted independently."  Matsushita, 475 U.S. at 588.

After carefully reviewing the record, we agree with the district court that the objectively observable market conditions are consistent with defendants' assertions (i) that VLT acted unilaterally in choosing customers for its video lottery machines in

South Dakota, and (ii) that the operator defendants acted independently in buying and leasing VLT's machines. Regarding the former, VLT has given legitimate business reasons for its sales practices, which we may not lightly disregard. See Lovett, 998 F.2d 580-81; Illinois Corporate Travel, Inc. v. American Airlines, Inc., 806 F.2d 722, 726 (7th Cir. 1986).[3] Regarding the operators' conduct, giving priority to customers in an established territory is to be expected, particularly when VLT machines are in short supply, and the prevalence of 50-50 splits in the early years of the video lottery is parallel conduct that, standing alone, lacks probative value. See Pumps and Power Co. v. Southern States Indus., Inc., 787 F.2d 1252, 1258 (8th Cir. 1986).

At oral argument, plaintiffs pointed to a letter sent from defendant Hub Music to Ramkota, Inc., a chain of licensed establishments, as direct evidence of price-fixing. The letter appears to be a joint proposal on behalf of MVA operators to lease VLT machines on common terms (including a 50-50 split) to the various Ramkota hotels located "in their respective areas." There is nothing in the record putting this proposal in context, and plaintiffs apparently did not argue its significance to the district court.[4] Because the letter disclosed the

_____

[3]Though VLT received at least one written complaint from an operator customer about another operator's "cost cutting," complaints by distributors are not sufficient to overcome the presumption of unilateral decision-making. See Lovett, 998 F.2d at 578; H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1544-45 (8th Cir. 1989).

[4]After oral argument, defendants moved to exclude the letter or to expand the record on appeal to include the author's deposition testimony regarding the letter.

-14-

author's affiliation with MVA, plaintiffs suggest it is proof of a general agreement among MVA members to fix standard lease terms. But it could also have been a specific proposal on behalf of multiple suppliers none of whom could satisfy the needs of a multi-location customer, which from an antitrust

We deny that motion because the letter was part of the record before the district court, and the deposition passages encompassed by the motion to expand the record were not.

standpoint is a very different document indeed. Without more context, the letter is too ambiguous to help plaintiffs defeat summary judgment.

For the foregoing reasons, we conclude that, absent additional evidence of concerted action, the market conditions emphasized by plaintiffs do not prove that "the inference of conspiracy is reasonable in light of the competing inference[] of independent action." Matsushita, 475 U.S. at 588.

**C.** Finally, plaintiffs' argue that the district court erred in discounting affidavits and secretly taped conversations, testimonial evidence that plaintiffs contend provides sufficient additional evidence of the alleged conspiracy to withstand summary judgment. This evidence consisted of the following:

1. In response to defendants' motion for summary judgment, plaintiffs submitted an affidavit by Bill Welk, a former partner of defendant James Koehler in developing motels. Welk averred that Koehler was late for a May 1989 business flight and explained that he had been meeting with MVA members at the "Goose Camp," where they agreed to "limit the area within which they conducted the video lottery business" and not compete in each other's route areas. Defendants responded with affidavits and business records establishing that Welk and Koehler could not have had such a meeting and conversation before January 1990. Plaintiffs responded with a second Welk affidavit in which he admitted confusion regarding the dates, reaffirmed that the conversation with Koehler did occur, and promised a third affidavit supplying the

proper dates.  Plaintiffs never submitted a third affidavit.

The district court noted that the Welk affidavit could be rejected on procedural grounds because plaintiffs disclosed neither Welk as a witness nor the substance of his affidavit during discovery.  Based on the summary judgment record, the court dismissed Welk's alleged conversation with Koehler as a "factual impossibility" that did not raise a genuine issue of material fact.  We agree.  Plaintiffs inexcusably concealed Welk

during discovery and then sprung his affidavit testimony during the summary judgment briefing process.[5] Despite years to perfect this sneak attack, presumably with the aid of Welk's business records, plaintiffs submitted an affidavit in which every verifiable detail was incorrect. When defendants pointed out the errors, including the critical error as to the date of the alleged conversation, Welk promised to clarify his recollection and then reneged on that promise. "Where a party emphatically and wittingly swears to a fact, it bears a heavy burden -- even in the summary judgment context -- when it seeks to jettison its sworn statement." Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991), cert. denied, 502 U.S. 822 (1992); cf. Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995); Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir. 1988). The district court properly disregarded the Welk affidavits.

2. Plaintiffs submitted a secretly tape-recorded conversation in May 1993 between the principals of plaintiff G & T Gaming and James Trucano, brother of defendant Michael Trucano. The ostensible purpose of the meeting was to urge Trucano to use his personal connections to help G & T obtain VLT machines. Plaintiffs cite the resulting conversation as evidence the defendant operators did not compete for each other's accounts and VLT only sold to MVA members. Trucano left the coin-vending distributor business in South Dakota in 1988, prior to the start-up of the video lottery. At his deposition, he denied firsthand knowledge of the South Dakota video lottery machine market, and plaintiffs have no evidence he participated in the conspiracy. His

---

[5]According to the Lottery Commission's November 1993 Report, witnesses at the Commission's hearing included "[o]ne licensed establishment owner, Bill Welk of
Aberdeen." Thus, concealment of Welk's assertions was unconscionable. A reasonable inference is that plaintiffs knew Welk's accusations against his former partner and current litigation adversary, Koehler, would not withstand scrutiny.

comments in the taped conversation are ambiguous as to whether operators avoid "stealing" accounts because of an agreement not to do so, and

lend no support to plaintiffs' theory that VLT enforced an operators' conspiracy. The district court properly discounted this tape as non-probative, inadmissible hearsay.

3. Plaintiffs submitted two secretly tape-recorded conversations in 1993 between Charles Huber, a G & T Gaming principal, and a competing operator, defendant James Koehler, owner of defendant Hub Music. Ostensibly, Huber was seeking either an "allotment" of VLT machines or to sell G & T Gaming to Koehler. In the course of their lengthy conversations, Huber repeatedly made statements or asked questions in a way that invited the unsuspecting Koehler to acknowledge an operators' conspiracy. Each time, Koehler either flatly denied that an anticompetitive agreement existed, responded ambiguously, or changed the subject.[6] Nothing Koehler

---

[6]For example, Huber's question, what happens if an MVA member "doesn't play by the rules," produced the following dialog:

Koehler:    [It means y]ou're no longer friends.

Huber:      I mean fine you're no longer friends but I mean there's gotta be more hold than that.

Koehler:    No.

Huber:      They don't get a supply of product or they get sanctioned or I assume you don't have anything in writing between all of the members.

Koehler:    We don't no, we're trying . . . as an association we're trying to make everybody more profitable -- we can do a better job, service our locations better, have money to reinvest[. Y]ou

said is inconsistent with unilateral behavior.  The district court properly discounted these tapes as too ambiguous for a reasonable jury to infer that a conspiracy existed.  <u>Accord</u> <u>Richards v. Neilson Freight Lines</u>, 810 F.2d 898, 903-04 (9th Cir. 1987).

know you make it sound like we're doing price fixing . . . .

4. Plaintiffs submitted three secretly tape-recorded telephone conversations in April, May, and August 1993 between G & T Gaming and Dana Waggener, who had just resigned as VLT's sales manager to work for a competing manufacturer.[7] Waggener said that he left VLT because he did not like its policy of not selling to all licensed operators and that VLT "protected the hell out of" the operators it preferred, who "kinda had their roots in the industry." Waggener's ambiguous statements are consistent with VLT's explanation of its sales policy and therefore do not support an inference that VLT acted as the enforcer of an operator-level conspiracy. Moreover, the statements were made while Waggener was working for a VLT competitor and were not in furtherance of the alleged conspiracy. Thus, the district court properly discounted these tapes as non-probative, inadmissible hearsay. See Fed. R. Evid. 801(d)(2)(E); United States v. Snider, 720 F.2d 985, 992 (8th Cir. 1983), cert. denied, 465 U.S. 1107 (1984).

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT

---

[7]Waggener later returned to VLT, so his deposition testimony did not support plaintiffs' conspiracy claim. Like the district court, we do not consider whether plaintiffs may avoid summary judgment by relying on secretly taped conversations that the unsuspecting declarant later disavows under oath.