# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1330

_____

Blomkest Fertilizer, Inc.; Cobden Grain   \*
& Feed, on behalf of themselves and all  \*
others similarly situated;           \*
                                            \*

           Plaintiffs            \*
                                            \*

Hahnaman Albrecht, Inc.; John Peterson, \*
doing business as Almelund Feed &    \*
Grain; Laing-Gro Fertilizers, Inc.;    \*
                                            \*

     Plaintiffs - Appellants    \*
                                            \*

Clearbrook AG Service, Inc., on behalf  \*   Appeal from the United States
of itself and all others similarly situated; \*  District Court for the
Reamford Liquid Fertilizer, Inc., on    \*   District of Minnesota.
behalf of itself and all others similarly  \*
situated; Tolley's, Inc., on behalf of itself\*
and all others similarly situated;      \*
                                            \*

           Plaintiffs            \*
                                            \*

James River Farm Service, Inc., on     \*
behalf of itself and all other similarly   \*
situated;                          \*
                                            \*

     Plaintiffs - Appellants    \*
                                            \*

Angela Coleman, on behalf of herself   \*

and all others similarly situated;    *
                                      *
            Plaintiffs                *
                                      *
AG Network, Inc.;                     *
                                      *
        Plaintiffs - Appellants       *
                                      *
Marcelline Farm Supply, Inc., on behalf *
of itself and all others similarly situated, *
                                      *
            Plaintiffs                *
                                      *
        v.                            *
                                      *
Potash Corporation of Saskatchewan,   *
Inc.; Potash Corporation of           *
Saskatchewan Sales, Inc.; Potash      *
Company of America, Inc.; IMC         *
Fertilizer Group, Inc.; Kalium        *
Chemicals, Ltd.; Kalium Canada, Ltd.; *
Noranda Minerals, Inc.; Central Canada *
Potash Co.; Noranda Sales Corporation, *
Ltd.; Cominco, Ltd.; Cominco          *
American, Inc.; Eddy Potash, Inc.; New *
Mexico Potash Corporation;            *
                                      *
        Defendants - Appellees        *
                                      *
Rio Algom, Ltd.;                      *
                                      *
            Defendant                 *
                                      *
PPG Canada, Limited; PPG Industries,  *
Inc.; IMC Global,                     *
                                      *
        Defendants - Appellees.       *

_____

Submitted:  November 17, 1997

Filed:   May 7, 1999
_____

Before BEAM, HEANEY, and JOHN R. GIBSON, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

A certified class of potash buyers appeals the district court's entry of judgment in favor of the defendant potash producers in this antitrust case.  The class claims that the producers conspired to fix potash prices in violation of section one of the Sherman Act, 15 U.S.C. §  1 (1994).  The district court adopted a recommendation of the Magistrate Judge concluding that the class had not produced any evidence supporting an inference of conspiracy.  Although much of the class's evidence of behavior in the potash industry was consistent with a price-fixing conspiracy, the court held that the facts were equally consistent with legal oligopolistic behavior.  Relying on Monsanto Company v. Spray-Rite Service Corp., 465 U.S. 752 (1984), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), the court entered summary judgment against the class.  In re Potash Antitrust Litigation, 954 F. Supp. 1334 (D. Minn. 1997).  The class appeals, arguing that the district court misapplied the standards of Monsanto and Matsushita to change the standard for summary judgment in antitrust cases.  We reverse in part and affirm in part.

The potash industry is an oligopoly[1] in which the producers ended a price war and raised prices dramatically.  The question is whether the class has shown that the

_____

[1]An oligopoly is a market in which there are few sellers.

new prices resulted from an agreement among the producers to raise and stabilize prices, rather than from innocent reactions to market conditions, combined with actions of the United States and Canadian governments.

Potash is a mineral which is an essential ingredient in fertilizer. Because potash is an essential ingredient, the demand for potash is "inelastic," meaning that people will continue to buy it even if the price goes up, and they will not buy much more, even if the price goes down. The effect of this inelastic demand is that low prices are bad for the producers because the low price does not result in greater sales, except insofar as one producer can take sales away from other producers. Conversely, producers benefit from high prices, because they can sell about as much potash and keep the extra money.

The market for potash in the United States is dominated by Canadian firms. Their share of sales in the United States rose in the early and mid 1980's. Canadian potash constituted 76.7% of the United States' domestic consumption in 1984, 82.6% in 1985, and 84.3% in 1986. David G. Haglund and Alex von Bredow, U.S. Trade Barriers and Canadian Minerals: Copper, Potash and Uranium 68. Not only did the Canadians have a tremendous share of world potash reserves (the province of Saskatchewan alone had nearly fifty percent of world reserves), but the Canadians also enjoyed the advantage of being closer to prime United States agricultural areas than were the U.S. domestic producers, who were concentrated in the Southwest.

The principal Canadian potash producers are defendants in this case: Potash Corporation of Saskatchewan Incorporated (PCS);[2] Potash Corporation of America

_____

[2]Including Potash Corporation of Saskatchewan Sales Limited, a subsidiary of PCS.

(PCA); IMC Fertilizer Group, Inc.; Kalium[3]; Noranda Minerals, Inc.[4]; and Cominco.[5] These Canadian firms are allied in Canpotex, a cartel that exists to sell potash outside the United States. (In addition to these Canadian firms, two affiliated American companies, New Mexico Potash Corporation and Eddy Potash, are also named as defendants.)

The biggest of these Canadian firms, PCS, was originally owned by the province of Saskatchewan and was run as a governmental company for the avowed purposes of providing jobs and promoting the local Saskatchewan economy. Unfortunately for the potash industry, due to a slump in agriculture, potash demand fell tremendously in the 1980's, resulting in oversupply. The effect of the oversupply was a potash price war, with prices bottoming in 1986 when PCS charged C$45.36 per ton FOB mine.[6] The industry was in crisis. PCS alone lost $103 million in 1986. The president of PCS Sales wrote in an internal memorandum that the industry would not be able to end the price war without "joint action":

---

[3]Including PPG Canada Limited, which operated Kalium as a division; PPG Industries, Inc., parent corporation of PPG Canada; and Kalium Chemicals, Ltd. and Kalium Canada, Ltd.

[4]Including Noranda Minerals, Inc., Noranda Sales Corporation, Ltd., and Central Canada Potash Company Limited, which amalgamated with Noranda Metals Industries Limited under Canadian law.

[5]Including Cominco, Ltd. and its subsidiary Cominco American Incorporated.

[6]Quoting actual prices in this case is quite treacherous because prices are variously given in Canadian and United States dollars, for metric tons and short tons, for different grades of potash, and for potash delivered to different places, often without specifying all these variables. Therefore, we give particular numbers only for purposes of illustration and do not base our legal reasoning or holding on any particular figures.

It is not possible for a single producer to affect [sic] a turn-around; however, joint action by a group of producers or governments could achieve this.

Given the competitive nature of the business, joint action in North America is not possible except through a vehicle such as Canpotex. Canpotex by itself cannot achieve the objectives unless there is tacit approval and support on the part of other potash exporters. The danger inherent in multilateral decisions by Canpotex (or PCS Sales) is that the world will again see us as a residual supplier. . . . PCS Sales' past support of price with a view to achieve stability is proof of the fallacy of such attempts.

In fact, Noranda, Kalium, PCA, and PCS had each tried to increase prices unilaterally during 1986, and were forced to rescind the increases when the other producers undercut them.

In 1986, the province of Saskatchewan elected a government which promised to privatize PCS. In preparation for privatizing the company, PCS replaced its management with Charles Childers, CEO, and William Doyle, sales chief, who came to PCS from rival company IMC. Childers was quoted in a trade publication as saying that it was incumbent on PCS "to lead" in order to "straighten out our own company and hopefully give some strength to the potash industry as a whole."

Also in 1986, two American producers[7] filed a complaint with the United States Department of Commerce alleging that the Canadian companies were dumping potash in the United States at less than fair value (which can mean below prices charged for exports to a third country, below domestic prices in the country where the product is produced, or below a reconstructed cost of production, Haglund and von Bredow, supra, at 65). The Department investigated the claim and in August 1987

---

[7]One of the American companies was New Mexico Potash Corporation, a defendant in this case. 954 F. Supp. at 1343.

issued a preliminary determination that the Canadian producers were dumping potash. The Department ordered the Canadian companies to post bonds on all exports to the United States, which would be payable to the United States as a duty if there were a final determination of dumping and injury to American producers. The amount of the bond varied for each firm according to the firm's "dumping margin," that is, the average amount by which the firm's United States sale price fell below the foreign market value in the cases examined by the Department. The dumping margins varied wildly, from 9.14 percent for IMC up to a crippling 85.2 percent for Noranda.

The Saskatchewan government responded to the United States's action by adopting legislation which would give the province the power to limit and prorate production among Saskatchewan producers. Haglund and von Bredow, supra, at 76. Within days of the introduction of the Saskatchewan legislation, on September 4, 1987, PCS announced that it would increase its prices by $35 per ton (from $58 to $93 per short ton for coarse grade f.o.b. mine), or sixty percent, to account for the bond expense. PCS's dumping margin was set at 51.9 per cent. PCS chose to raise its price only by $35, the amount necessary to pay duties on the industry average dumping margin of 36.62 per cent, rather than by the amount necessary to pay its own duty of 51.9 percent. PCS's choice of the industry average figure was, at the least, an attempt to pick a figure that other producers would follow. On September 11, 1987, the other Canadian producer defendants all[8] announced either a $35 price increase or a new price of $93, rather than increasing the price by the amount necessary to cover their individual duty costs.

On January 8, 1988, the Canadian producers reached an agreement with the Department of Commerce, suspending the earlier order. The suspension agreement

_____

[8]The PCA price list is dated September 16, 1987, but a September 11 memo to the file by Vice President John Ripperger refers to the price increase as having already taken place.

imposed a minimum price on Canadian producers selling in the United States market, but oddly, the minimum price chosen was still less than the "foreign market value": the Canadians were only forbidden from undercutting "foreign market value" by more than fifteen percent of the producer's dumping margin. Haglund and von Bredow, supra, at 88. The literal terms of the suspension agreement made each producer's minimum price vary with its own foreign market value (which was arrived at by different methodologies for different firms) and with its own dumping margin; as the defendants' expert William Barringer opined, the "uncertainties" in such a calculation make it impossible to predict with accuracy what price for any particular transaction would be in compliance with the agreement. However, correspondence from the Department of Commerce, which had responsibility for monitoring compliance with the suspension agreement, indicates that the Department used an industry average figure in assessing compliance.

As soon as the suspension agreement was in place, PCS again led the way in determining industry pricing, announcing it would rebate the earlier $35 surcharge, and on January 11, 1988, publishing its new price list at $86 per ton for granular grade, an $18 increase. The other Canadian producers matched PCS's increase within 11 days, and Kalium raised its price to $87. 954 F. Supp. at 1366. The Department of Commerce, in monitoring compliance with the agreement, noted that the agreement imposed an average floor price of $60.67, and that in the five months following the agreement the average price charged was $79.28.

The class's expert, Prof. Gordon Rausser, opined and presented data purporting to show that the industry average prices for potash were higher than would be expected based on market factors during the 1988-1993 period (i.e., prices were "supra- competitive"). Perhaps more to the point, prices remained significantly higher than the minimum prices imposed by the suspension agreement from 1988 to

1993,[9] with the exception of a short period in 1990 when PCS cut its prices drastically for the avowed purpose of stabilizing prices within the industry. Only in the wake of this January 1990 "market correction," did prices briefly dip below the suspension agreement price floor.

The plaintiffs filed suit against the Canadian producers and two affiliated American producers, New Mexico Potash Corp. and Eddy Potash, alleging a conspiracy to raise and stabilize prices. Their proof of the conspiracy was circumstantial, consisting of the economic evidence of supracompetitive pricing and evidence of price discussions among competitors.

The defendants moved for summary judgment on the ground that the class had not produced any evidence that showed that the defendants had conspired, rather than setting their prices individually taking into account their competitors' probable responses. The motion was referred to a magistrate judge. The class's strongest evidence that the supracompetitive prices resulted from conspiracy was the evidence of price-verification communications among competitors and complaints and threats among competitors about discounting. The magistrate judge rejected each of these types of evidence on the ground that they did not exclude the possibility of independent action. In re Potash Antitrust Litigation, 954 F. Supp. 1334 (D. Minn. 1997). The magistrate judge concluded that the price-verification practices were

_____

[9]The dissent argues that Rausser does not take into account the effect of the antidumping proceedings, and his testimony is thus irrelevant. Infra at 43. The only aspect of Rausser's evidence on which we have relied is his evidence about forecasted and actual price levels. His price level evidence specifically includes the prices that he contends would be required under the antidumping suspension agreement; therefore, he obviously does take into account the effect of the antidumping proceedings. The dissent's attack on Rausser's conclusion that a conspiracy existed is irrelevant to our decision; we do not rely on Rausser's opinion on this ultimate question, but have necessarily undertaken our own analysis of whether the evidence sufficed to make a prima facie case of conspiracy.

irrelevant because they were sporadic and concerned completed sales. Id. at 1378. The magistrate judge similarly disregarded the evidence of competitors complaining and threatening each other, because the evidence did not exclude the possibility that the competitors on the receiving end of these communications could have ignored the threats and complaints and acted independently. E.g., id. at 1375, 1384. The district court adopted the magistrate judge's recommendations and entered summary judgment for the defendants. Id. at 1339.

On appeal, the class argues that the district court misapprehended the summary judgment standard, requiring the plaintiffs to establish their case beyond a reasonable doubt to avoid summary judgment.

## I.

The standard for summary judgment in antitrust cases is, of course, the same as for summary judgment generally: "[T]he evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992) (emphasis added) (quotation omitted); Bathke v. Casey's General Stores, Inc., 64 F.3d 340, 342-43 (8th Cir. 1995) ("We must review the record in the light most favorable to the non-moving party. . . ."). However, substantive requirements of the antitrust laws "limit the range of permissible inferences from ambiguous evidence in a [Sherman Act] § 1 case." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Specifically, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Id.

Often in conspiracy cases, the only difference between legal and illegal conduct is the existence of an agreement to do the same thing the parties could have done legally without an agreement. Naturally, the parties cannot be relied on to confess

that they have entered the forbidden agreement, so conspiracy cases usually must be proved by circumstantial evidence. ES Development, Inc. v. RWM Enterprises, Inc., 939 F.2d 547, 553-54 (8th Cir. 1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidence by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators.") (quotations omitted), cert. denied, 502 U.S. 1097 (1992). As Justice Powell observed in Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984), a case involving vertical[10] conspiracy to set prices, "[T]he economic effect of . . . unilateral and concerted vertical price setting . . . is in many, but not all, cases similar or identical. And judged from a distance, the conduct of the parties in the various situations can be indistinguishable." Id. at 762 (citations omitted). Because it is important to punish only the forbidden conduct and to avoid deterring legal economic activity, Matushita, 475 U.S. at 594, a submissible antitrust conspiracy case must include some evidence that "tends to exclude the possibility of independent action by the [alleged conspirators]." Monsanto, 465 U.S. at 768; Matsushita, 475 U.S. at 574.

In determining whether the evidence tends to exclude independent action, we must take into account the defendants' "legitimate business reasons" for their conduct, The Corner Pocket v. Video Lottery Technologies, Inc.,123 F.3d 1107, 1112 (8th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 1054 (1998). If the plaintiffs' evidence supports the defendant's theory of the case as easily as the plaintiffs', summary judgment for the defendant is proper. See id. at 1109; City of Tuscaloosa v. Harcos Chemicals, Inc., 158 F.3d 548, 569 (11th Cir. 1998). Although we must weigh the defendants' evidence in the balance in evaluating the sufficiency of the plaintiffs' case, Corner Pocket, 123 F.3d at 1112, the plaintiffs' evidence only has to "tend to exclude" innocent explanation--it does not have to exclude it absolutely. See In re Prescription

---

[10]A vertical conspiracy involves people operating at different levels of the production and distribution chain, e.g., manufacturers and the wholesalers to whom they sell. A horizontal conspiracy involves competitors operating at the same level of the production and distribution chain, e.g., rival grocery stores.

Brand Name Drug Antitrust Lit., 123 F.3d 599, 613 (7th Cir. 1998) (Summary judgment in antitrust case not warranted even if key evidence "susceptible of an innocent interpretation" because record must be viewed in light most favorable to nonmovant), cert. denied, ___ U.S. ___, 118 S. Ct. 1178 (1998); Apex Oil Co. v. DiMauro, 822 F.2d 246, 253, 257 (2d Cir.) (choice between reasonable inferences left to the fact-finder at trial), cert. denied, 484 U.S. 997 (1987). Monsanto itself held that evidence of a newsletter article should be submitted to a jury where an inference of conspiracy from the article was reasonable, but not inevitable. The Court stated: "The interpretation of these documents and the testimony surrounding them properly was left to the jury." 465 U.S. 766 at n.11. Admittedly, there was other "substantial direct evidence" of conspiracy in Monsanto, id. at 765, but the newsletter issue points out that there is still a role for the jury in choosing among inferences in section one cases. The plaintiffs' evidence must amount to more than a scintilla, but the plaintiff does not have to outweigh the defendant's evidence item by item. Rossi v. Standard Roofing, Inc., 156 F.3d 452, 466 (3d Cir. 1998). In Monsanto the Court recognized that the defendant's evidence had "force," but concluded that the case was properly submitted to a jury. 465 U.S. 768 at n.14. "Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." Eastman Kodak, 504 U.S. at 468 (emphasis added).

In applying the Monsanto standard, we must view the evidence as a whole, rather than asking whether each item of evidence viewed in isolation meets the standard. In re Workers' Compensation Ins. Antitrust Lit., 867 F.2d 1552, 1563 (8th Cir.), cert. denied, 492 U.S. 920 (1989); City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d at 565 (plaintiffs' expert data and testimony "need not prove the plaintiff's case by themselves; they must merely constitute one piece of the puzzle"); Apex Oil Co., 822 F.2d at 254-55.

We review the district court's determination de novo. Bathke, 64 F.3d at 343.

## II.

The type of case alleged here is a good illustration of the abstract principles stated in <u>Monsanto</u> and <u>Matsushita</u>. In this case, it is undisputed that PCS, the largest firm in a concentrated market (the oligopoly), decided to stop the carnage of price wars by raising and stabilizing prices. The other sellers in the industry followed PCS's lead and all received higher prices for their potash. This, of course, is what any rational oligopolist, not just antitrust villains, would want to do. According to accepted economic theory, one would expect a rational oligopolist to raise his price hoping the others would follow his lead. The other oligopolists know that if they keep their prices low, the brave price leader will simply cut his prices and the battle will resume. On the other hand, if they raise their prices in turn, they can content themselves with selling less product at a higher price and end up with more money in their pockets. <u>See</u> <u>Clamp-All Corp. v. Cast Iron Soil Pipe Institute</u>, 851 F.2d 478, 484-85 (1st Cir. 1988) (Breyer, J.), <u>cert. denied</u>, 488 U.S. 1007 (1989). The loser will be the consumer, who benefits from competition, not peaceful coexistence between suppliers. Even though this phenomenon of "interdependence" or "oligopoly pricing" is in a sense anticompetitive, it is legal, so long as it occurs without an agreement among the oligopolists. <u>Id.</u> As then-Judge Breyer explained:

> Courts have noted that the Sherman Act prohibits <u>agreements</u>, and they have almost uniformly held, at least in the pricing area, that such individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do <u>not</u> constitute an unlawful agreement under section 1 of the Sherman Act. That is not because such pricing is desirable (it is not), but because it is close to impossible to devise a judicially enforceable remedy for "interdependent" pricing. How does one order a firm to set its prices <u>without regard</u> to the likely reactions of its competitors?

851 F.2d at 484 (emphases in original).

On the other hand, the law can and does prohibit oligopolists from agreeing to match prices. If the oligopolists agree to coordinate price increases, their actions may look the same as innocent oligopoly pricing from the outside, but they have committed a per se violation of section one of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 212-18 (1940). The law forbids nonverbal agreements in restraint of trade, as well as express ones; otherwise, the law would be emasculated as competitors accomplished the forbidden goal with a wink and a nod. The Supreme Court's classic formulation of the conspiracy requirement comes from American Tobacco Co. v. United States, 328 U. S. 781, 809-10 (1946):

> No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. . . . The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.

(emphasis added) (citations omitted). Accord Monsanto, 465 U.S. at 768 (Test is whether the evidence "reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.").

Therefore, parallel pricing can result either from legal, almost inevitable behavior in a concentrated market, or from an unlawful agreement in restraint of trade. Although parallel pricing evidence is consistent with illegal conduct, it is equally consistent with lawful conduct, and thus does not tend to exclude the possibility of independent action. Parallel pricing in a concentrated market cannot make a submissible section one case, although it may set the groundwork for such a case. See State of Arizona v. Standard Oil Co. (In re Coordinated Pretrial Proceedings), 906

-14-

F.2d 432, 444 (9th Cir. 1990) ("We recognize that such interdependent pricing may often produce economic consequences that are comparable to those of classic cartels. Nonetheless, proof of such pricing, standing alone, is generally considered insufficient to establish a violation of the Sherman Act."), cert. denied, 500 U.S. 959 (1991).

Numerous courts have stated that plaintiffs can establish a prima facie case of conspiracy by showing parallel prices together with "plus factors." E.g., Wallace v. Bank of Bartlett, 55 F.3d 1166, 1168 (6th Cir. 1995), cert. denied, 516 U.S. 1047 (1996); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1232-33 (3d Cir.), cert. denied, 510 U.S. 994 (1993); Apex Oil Co., 822 F.2d at 253-54; Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). Some factors mentioned as "plus factors" are actually background facts, which though they may make the existence of a conspiracy more likely, do not suffice to prove a conspiracy. For instance, "motive to conspire","opportunity to conspire" or "high level of interfirm communications," all make conspiracy possible, but do not tend to exclude the possibility of independent action. Apex Oil, 822 F.2d at 254. On the other hand, acts that would be irrational or contrary to the defendant's economic interest if no conspiracy existed, but which would be rational if the alleged agreement existed, do tend to exclude the possibility of independent action. Re/Max Internat'l, Inc. v. Realty One, Inc., Nos. 96-3362, 96-3469 and 96-3470, 1999 WL 184350 at * 11 (6th Cir. April 6, 1999); Harcros Chemical, 158 F.3d at 572.

## III.

In this case, the class pursues a number of plus factor theories, which the district court concluded were inadequate to make a prima facie case. Of the "plus factors" that merely make conspiracy possible, such as motive and opportunity to conspire, the plaintiffs have adduced abundant evidence.

Moreover, the plaintiffs have introduced a significant amount of evidence of conduct that we can only characterize as solicitations to enter a price fixing agreement. Most, but not all, of the solicitations were by PCS. For instance, PCS freely complained to Kalium about Kalium's failure to adhere to pricing cut-offs. It was the custom in the industry to give lower prices at times of year when there was no immediate need for fertilizer, but to raise prices during high use periods. Kalium published price lists announcing the pricing cut-off pattern, but in fact often shipped at the lower price after the cut-off date when it did not get orders filled before the cut-off date. PCS sales chief Bill Doyle repeatedly upbraided Kalium's Vice President Robert Turner for shipping at the lower price after the cut-off date. Turner responded "something to the effect" that he would run his own business. Another time, Doyle called Turner and advised him that neither PCS, IMC nor Cominco planned to accede to a certain customer's request to delay filling an order–that is, to ship at the old price after the cut-off. Turner answered that Kalium would try to ship by a certain date, which intent it had already published in a letter to its customers. In the same vein, Doyle approached Turner about a certain bid and told Turner that Kalium's action was "wrong." John Ripperger, Vice President of PCA, also testified that Doyle asked him if PCA was going to institute a price increase and not carry over product at the old price; Ripperger interpreted this question to mean that Doyle "would prefer that we don't make sales at the old price." Also, Doyle complained to Ripperger that PCA's pricing was undermining prices in Florida. Ripperger reported a conversation in which Gary Snyder of PCS asked a PCA salesman if he had sold at a certain price, and then said, "We [PCS] will take it [price] down and bury you [PCA] if that's what you want." In 1988, after the sale of Kalium, Charles Childers, the CEO of PCS, called on Jay Proops, one of Kalium's new owners, armed with a chart showing that PCS was losing market share and that Kalium and other producers were gaining. Childers said Kalium was undercutting the price. Proops did some research and concluded that Childers' chart had incorrect information and that Kalium was not undercutting. Therefore, Proops took no action in response to Childers's visit. In August 1990, Childers telephoned Joseph Sullivan, the other owner of Kalium. Childers told

Sullivan that PCS's "price leadership was not working, despite major efforts" and that Childers "wanted to discuss this issue" with Sullivan. Sullivan declined to discuss prices. Another time a PCS employee took advantage of a trade meeting to apologize to Kalium's Turner about a low bid PCS had made by mistake. The PCS employee testified that he explained the mistake to Turner because he had "some concern that it [the low price] may spread in the marketplace," and that he "was hopeful that it wouldn't go any darn further." Turner testified that Kalium matched the bid, but the reaction was "pretty much confined to that account. It did not go beyond that."

Though most of these overtures were initiated by PCS, on isolated occasions others did the same. Robert Turner of Kalium called John Ripperger of PCA to complain about a salesman who was cutting prices in Wisconsin. Similarly, Kip Williams of IMC complained to John Ripperger of PCA about price-cutting in Florida.

The magistrate judge held this solicitation evidence was inadequate to show conspiracy for two reasons. First, the magistrate judge stated that the complaints and inquiries about pricing cut-offs were only complaints and inquiries, not "requests" to stop post-cutoff shipments. 954 F. Supp. at 1376. We reject this reasoning because it is unlikely that these businessmen would waste their time making telephone calls to competitors without any expectation that their calls might have business results. It is reasonable to infer that they hoped for a favorable response from these contacts.

The magistrate judge's second reason for holding that the solicitations did not prove conspiracy is that there was no evidence that the people on the receiving end of those solicitations accepted them and formed a deal. Id. This is an important point. The evidence of solicitation is relevant, because it shows conspiratorial state of mind on the part of the solicitor and may also indicate that the solicitor was acting upon an earlier agreement. 6 Phillip E. Areeda, Antitrust Law § 1419c (1986) ("Besides serving as direct evidence of a particular agreement, a solicitation might be circumstantial evidence of an ongoing conspiracy. Although no favorable response

to the solicitation is shown, the solicitation itself might be the product of a prior agreement.") (footnote omitted).  But though this evidence sets the scene for conspiracy, it does not tend to exclude the possibility of innocence, since it only definitively shows a guilty intent on the part of the solicitor, rather than a mutual meeting of the minds.[11]   Of course, it is possible to accept a solicitation by acting in accord with it, rather than by expressing assent, see Interstate Circuit v. United States, 306 U.S. 208, 226-27 (1939), but the defendants can plausibly contend that their actions would have been the same regardless of the solicitation.  Compare Monsanto, 465 U.S. at 763 (complaints together with action consistent with complaint on vertical conspiracy case not sufficient evidence of conspiracy) with Brown v. Pro Football League, 518 U.S. 231, 241 (1996) ("Antitrust law also sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable.").  The class has not shown actions taken in response to the solicitations that are inconsistent with independent action.

Therefore, the crucial question remains whether the plaintiffs have shown any plus factors that do tend to exclude the possibility of independent action.  We, like the district court, conclude that many of the class's theories are inadequate to carry the plaintiff's burden under Monsanto,[12] but we believe the evidence of price verification

---

[11]Commentators observe that even an unaccepted solicitation facilitates coordination of prices in an oligopoly, see Areeda, supra, § 1419d, but this is not the class's theory in this case.

[12]In particular, we conclude that the magistrate judge was correct in holding that many of the alleged actions against self-interest by the defendants were simply one of a number of reasonable actions those defendants could have taken. E.g., 954 F. Supp. at 1363-65, 1368.  The law does not permit us to second-guess the defendants' plausible business decisions. Corner Pocket, 123 F.3d at 1112; see Apex Oil, 822 F.2d at 254.  The defendants' decisions to enter the suspension agreement instead of trying their luck in a full blown contested proceeding with the Department

communications among competitors does establish a prima facie case, when combined with the structure of this industry and supracompetitive pricing.

The class has produced evidence that the defendant producers cooperated in disclosing prices they had charged on particular sales. The industry practice was that each producer published a price list stating its price, the dates for which that price would be available, and any discounts that the producer would extend. The price lists were widely distributed to customers and certainly were no secret. However, actual prices sometimes deviated from the lists. For instance, Steve Hoffman of IMC testified that the percentage of the time that IMC received list price was small. When Childers and Doyle came to PCS, a key aspect of their program to raise industry prices was to insist on the list price. Doyle stated in an industry publication: "When I first came on board in the spring of 1987, the first word I put out to our sales force was that the price list was our price, stick to that price and no bending. Anybody who bends was out of here." Despite published price lists with the high follow-the-leader price, the producers continued to undercut each other in privately negotiated deals. When word of the discounting got around to PCS, PCS executives, particularly sales chief William Doyle, were quite active in contacting the discounter and asking for verification of the rumored price. Significantly, Doyle testified that he never made any such price verification calls before 1987.[13] The number of these verification

_____

of Commerce, and the decision of PCS to sell potash to PCA are two examples of decisions that certainly have a rational basis. Even if later armchair quarterbacks disagree with whether they were the most profitable courses of action, reasonable people might make these decisions in the absence of an illegal agreement. Therefore, such actions do not tend to exclude the possibility of innocence. See Willman v. Heartland Hosp. East, 34 F.3d 605, 611 (8th Cir. 1994), cert. denied, 514 U.S. 1018 (1995).

[13]There was, however, very sketchy evidence that occasional price verification contacts occurred before the alleged conspiracy dates. Gene Jones, a sales manager at PCS, testified that employees might ask their competitors about a price if they saw

communications was difficult to pin down, but Bill Doyle estimated he initiated or received three to four calls per year with PCA, five to six per year with IMC, three to four per year with Cominco, five to six total with Kalium , "a few" with NMPC, and one to two total with Noranda. Doyle was by no means the only person making such calls on behalf of PCS, and there is evidence that the other defendants called each other as well (except that there is no evidence of others calling Noranda).

These exchanges were often between high level executives who were responsible for pricing decisions for their companies or who conveyed the price information to those who did set prices. For instance, Dale Massie, Vice-president of marketing of Cominco, testified that he had price verification communications with Bill Doyle, head of sales at PCS. Massie testified that he made up the Cominco price lists, and the evidence shows that Doyle had a key role in determining PCS pricing policy. Charles Hoffman at IMC reported price information from Doyle to his superiors to inform them that "we would have to meet" PCS's price. Similarly, John Ripperger, Vice President of PCA, had price verification discussions with Doyle, and Doyle said he had obtained price information from John Huber, Kalium's Vice President of Sales. The exchange of information between high level executives, who were in a position to respond to what they learned, distinguishes this case from Jacob Blinder & Sons v. Gerber Prods. Co. (In re Baby Food Antitrust Litigation), 166 F.3d 112, 125-26, 135 (3d Cir. 1999), in which the court held that price discussions among low level employees did not show a conspiracy. In Baby Food, the court stated: "No evidence . . . shows that any executive of any defendant exchanged price or market information with any other executive." Id. at 135.[14]

_____

each other, but that they were not permitted to telephone each other. He said this could have happened a total of three to five times in 1986 and 1987. This evidence is too skeletal to seriously undermine the class's case.

[14]The dissent argues at pages 41-42, infra, that the facts of Baby Food show high-level executives collected information gathered by low-level employees. See

Price verification communications can violate section one in two ways.[15] First, an agreement to exchange such communications can constitute an unreasonable restraint of trade under the rule of reason if the anticompetitive effect of the agreement outweighs its beneficial effects.  Penne v. Greater Minneapolis Area Board of Realtors, 604 F.2d 1143, 1148 (8th Cir.  1979);  In re Coordinated Pretrial Proceedings, 906 F.2d at 447 n.13.  Second, the exchange of such information can be evidence of the existence of an agreement to fix or stabilize prices.  See Penne, 604 F.2d at 1149; In re Coordinated Pretrial Proceedings, 906 F.2d at 447 n.13; In re Plywood Antitrust Litigation, 655 F.2d 627, 633-34 (5th Cir. Unit A 1981); Morton Salt Co v. United States, 235 F.2d 573, 577 (10th Cir. 1956) (competitors' exchange of price information "is a factor appropriately considered in determining the existence of a conspiracy").  It is this second theory that the class pursues in this case.

As we have said, acts that would be contrary to the actor's self interest in the absence of a conspiracy but which can be explained as part of a conspiracy, provide the crucial type of plus factor evidence necessary to exclude the possibility of independent action.  The class contends that "the price verification calls were inconsistent with the 'pricing secrecy' sought by participants in oligopolistic industries because in such industries 'each producer would like to secretly "shade" price[s],

---

166 F.3d at 118-19.  There is a crucial difference between gathering information to use to one's own advantage and giving out information for one's competitors to use to their advantage (and one's own detriment).  In this case, it is the potash producers' pattern of giving their competitors valuable information which we  identify as an act ostensibly contrary to the producers' self-interest.  See page 24, infra.

[15]The dissent quotes United States v. United States Gypsum Co., 438 U.S. 422, 441 n.16 (1978), in effect for the proposition that exchange of price information among competitors is not per se illegal.  Infra at page 41 n.25.  This proposition is of course true, and that is why we state above that such communications violate section one only if they fail under the rule of reason or if they are evidence of an agreement to fix or stabilize prices.  That said, the fact that such exchanges are not per se illegal clearly dose not mean that they are always permissible.

thereby gaining sales and avoiding retaliation.'" The class's argument finds support in the reasoning of United States v. United States Gypsum Co., 438 U.S. 422 (1978), which stated:

> Price concessions by oligopolists generally yield competitive advantages only if secrecy can be maintained; when the terms of the concession are made publicly known, other competitors are likely to follow and any advantage to the initiator is lost in the process. Thus, if one seller offers a price concession for the purpose of winning over one of his competitor's customers, it is unlikely that the same seller will freely inform its competitor of the details of the concession so that it can be promptly matched and diffused.

438 U.S. at 456 (citations omitted). Gypsum's observation about the expected result of sharing information with competitors about price concessions is borne out by the record in this case. For instance, Steve Hoffman of IMC testified about several cases in which he called competitors (PCS and PCA) to ask whether they had really made the concessions reported by customers. When PCS and PCA confirmed the price cuts, IMC lowered its price to meet them. Similarly, Dean McWilliams of NMPC/Eddy recalled a time when Bill Doyle called him and asked about a particular price. McWilliams said he "probably confirmed the price," and that his company then lost the order, so he believes that Doyle responded to the information by meeting his price.

The magistrate judge cited several reasons in holding that the price confirmation discussions were immaterial. First, the information concerned completed sales, rather than future prices. 954 F. Supp. at 1379. This distinction does not appear determinative in this case because the defendants said they were interested in the completed sales prices because they wanted to know what to charge. For instance, David Benusa of Cominco made verification calls so he could "[m]eet a competitive price if that opportunity was available."

Second, the magistrate judge discounted the price verifications as "sporadic" because they were not coordinated or systematic. 954 F. Supp. at 1379. The evidence indicates that the defendants called each other when they had reason to think their competitors were cutting prices, and that they responded to each other's inquiries. The total number of such inquiries is difficult to set, but the defendants characterize it as "no more than several dozen"--surely more than a scintilla. Cf. United States v. Container Corp., 393 U.S. 333, 335 (1969) (price-fixing agreement where "all that was present was a request by each defendant of its competitors for information as to the most recent price charged or quoted, whenever it needed such information" . . .; "[t]here was to be sure an infrequency and irregularity of price exchanges.") Moreover, Gypsum specifically observed that sporadic exchanges, as opposed to coordinated exchanges, were inimical to the self-interest of the party giving the information. 438 U.S. at 456.

Third, the magistrate judge said that the evidence indicated the defendants were not always candid with each other, relying on a statement by one deponent that he was "probably" not truthful, and by another that his counterpart at another company had refused to discuss prices with him. 954 F. Supp. at 1379. These two statements cannot cancel out other testimony in which the producers' executives stated that they did furnish the requested information and that they based their prices on information supplied by competitors. Moreover, the two statements are hardly sufficient to support a summary judgment for the defendants. Jerry Jackson of PCS testified that Robert Turner of Kalium refused to discuss prices with him, but Turner himself testified that this took place after this suit was filed in 1993. Testimony about post-lawsuit behavior does not establish conclusively what the defendants' conduct was before the lawsuit. Nor should the case hinge on the testimony of Gary Snyder of PCS, who said that he "probably" was not truthful in responding to price verification inquiries. This statement is uncertain on its face and is not the kind of testimony on which we should resolve a case as a matter of law.

Fourth, the magistrate judge held that there was a legitimate business reason for the price verification inquiries, because the defendant inquiring wanted to know the competitor's selling price. 954 F. Supp. at 1380. This is certainly a business reason for asking for prices, but the question is whether the competitor supplying the information acted contrary to his interest by telling. The Supreme Court in Gypsum refused to carve out a safe harbor for verifying customers' reports of prices. The defendants argued that the need to verify customer reports about prices to claim a "meeting competition" defense under the Robinson-Patman Act should justify oligopolistic competitors' practice of asking each other about price concessions. The Court concluded that the need to verify customer reports should establish no defense under the Sherman Act. The Court reasoned that if there were no agreement to provide the information reciprocally, the competitor providing information would be acting contrary to his own interest in responding to the request. 438 U.S. at 456. If there were "an agreement, either tacit or express, providing for reciprocity among competitors in the exchange of information" it would likely have the effect of harming competition. Id. at 457. The Court stated:

> Such an agreement would make little economic sense, in our view, if its sole purpose were to guarantee all participants the opportunity to match the secret price concessions of other participants . . . . For in such circumstances, each seller would know that his price concession could not be kept from his competitors and no seller participating in the information-exchange arrangement would, therefore, have any incentive for deviating from the prevailing price level in the industry. Regardless of its putative purpose, the most likely consequence of any such agreement to exchange price information would be the stabilization of industry prices. . . . [S]uch an agreement would have the effect of eliminating the very price concessions which provide the main element of competition in oligopolistic industries. . . .
>
> Especially in oligopolistic industries such as the gypsum board industry, the exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions.

-24-

Id. at 457 (citations omitted).

Thus, in this case, if the price inquiries were unilateral, there would be no good reason to respond, as the competitors did. If the exchanges were pursuant to a reciprocity agreement, in this oligopoly setting, in which prices rose dramatically, the agreement would appear to have been anticompetitive. See Container Corp., 393 U.S. at 340 (Fortas, J. concurring). Action pursuant to such an agreement is not a "legitimate business reason."

Moreover, these private communications between competitors have no purpose of informing customers of prices, such as the advance announcements of price increases in Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37, 54 (7th Cir. 1992), or the advertisement of fees in Wallace v. Bank of Bartlett, 55 F.3d 1166, 1169 and n.5 (6th Cir.1995), cert. denied, 516 U.S. 1047 (1996). Cf. Market Force, Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1173 (7th Cir. 1990) (defendant broker announced intent to pay reduced commission to buyer's brokers; legitimate business reason was that other brokers needed to know in advance what commissions defendant was willing to pay). See also United States v. Citizens & Southern Nat. Bank, 422 U.S. 86, 113-14 (1975) (correspondent bank program legitimate reason for "intimate and continuous cooperation and consultation on interest rates"). To the contrary, the prices stated here were discounts from the published price lists that reflected the prices the producers wanted to charge. Nor is there any evidence of special necessity for horizontal price communications, such as the customer fraud which justified the producers' practices in Cement Manufacturers Protective Association v. United States, 268 U.S. 588, 595-96 (1925). The price communications in this case are more like those in In re Coordinated Pretrial Proceedings, 906 F.2d at 448, which served "little purpose" other than facilitating price coordination.

The defendants argue that the evidence shows no anticompetitive effect from the defendants' price verification practices, because the depositions showed that when

the producers learned of their competitors' discounts, they matched them, thus lowering their prices, not raising them. Though the short term effect of price exchanges may have been to lower the price for a particular sale, it is an economic truism recognized in Gypsum that, where discounts will be promptly discovered and matched, they are less likely to happen. 438 U.S. at 457. Thus, the long-term effect (and intent) of the pattern of price exchanges could be to stabilize prices, regardless of its short-term effect on one sale. See Container Corp., 393 U.S. at 340 (Fortas, J., concurring) (effect of price exchange was to "'stabilize' prices by joint arrangement--at least to limit price cuts to the minimum necessary to meet competition"). More to the point, the communications in this case occurred in the context of an industry with excess capacity; a sudden end to a price war; the industry giant's publicly avowed ambition to lead the industry to higher prices; large price rises above the floor set by the suspension agreement; and a pattern of competitors threatening and rebuking each other's pricing conduct. To this scene, we add private price verification communications among competitors having no legitimate business purpose. This evidence of conspiracy to fix and stabilize prices, though by no means unassailable, is sufficient to survive summary judgment.

In addition to the price verification practices, some evidence concerning PCS's "market correction program" in December 1989 also tends to exclude the hypothesis of independent action. On December 18, 1989, PCS cut its prices by $18 a ton for five days. A PCS witness stated that the purpose (and effect) of the program was to stabilize prices in the industry.[16] While this program was clearly meant to discipline price cutters, such price leadership in itself is not illegal. However, a memo written by a high level Kalium executive, John Huber, gives rise to an inference that the

_____

[16]PCS's Carlos Smith testified:
Q.  [W]as it an attempt to stabilize prices?
A.  Yes

. . .

Q.  And did it work?
A.  It leveled them.

program was in response to an earlier agreement. Huber wrote: "Program was a market correction. Weren't trying to teach other people. Only got tired of people who kept chipping away. Program was reasonable one--checked with people. . . . People started cheating . . . . We wanted to get their attention. Program to be short, very specific." (emphasis added) Huber said he did not recall who he had been talking to when he made these notes, but the use of the phrase "We wanted to get their attention" suggests he was taking dictation from PCS.[17] The magistrate judge dismissed this memorandum because "it is equally reasonable to read the terms ["cheating"] as referring to a general price deterioration, or to prices that were lower than those allowed under the Suspension Agreement." 954 F. Supp. at 1370. By this reasoning, defendants would be entitled to summary judgment if they could come up with any innocent explanation whatsoever for the evidence, no matter how unikely. Under Eastman-Kodak it is enough if the plaintiff's inference is reasonable--it does not have to be inevitable. 504 U.S. at 468. In plain English, the use of the word "cheating" implies an agreement or convention, not independent action. Without an agreement, price cutting would be called "competing" not "cheating." The magistrate judge's alternative suggestion that PCS was concerned about others cheating under the suspension agreement is far-fetched, since, according to Prof. Rausser's chart, the only time the prices dipped below the suspension agreement floor levels was in the aftermath of PCS's market correction program in January and February 1990. Dipping prices below the suspension agreement floor is not a convincing sign of PCS's devotion to the agreement. Under the Eastman Kodak standard, the inference of conspiracy is reasonable and the class is entitled to the benefit of it.

---

[17]Another memorandum in the same time frame prepared by a Noranda employee states: "Casual conversation at the SMA meeting with a fairly senior PCS guy got quite pointed about 'market correction plan' and he was happy to indicate that they could do it again . . . . I don't think the conversation was idle." The similarity of the messages lends additional weight to the inference that PCS was the source of information for the Kalium memo.

The class also points to another piece of evidence that, though its probative power is not great, does tend to exclude the hypothesis of independent action. This is the Canpotex memorandum of Friday, January 8, 1988, which states:

> FYI Canadian potash producers have reached agreement with the United States Department of Commerce and all dumping action has been suspended for a minimum of 5 years. It is rumored that the USD per metric ton increase posted by Canadian producers in 1987 to cover possible tariff payments to the U.S. Govt will be refunded in full or part. <u>In the meantime new price lists are being issued on Monday Jan. 11 at: Standard Grade USD 80.00; Coarse Grade USD 84.00; Granular Grade USD 86.00</u>.

954 F. Supp. at 1366 (emphasis added). Canpotex was the Canadian producers' cartel organized for sales outside the United States. The prophecy by Canpotex that its owners would issue new "price lists" as of Monday, January 11, does indeed tend to show the price increase was coordinated, because otherwise it would have been impossible to know in advance what the individual producers would do. The magistrate judge dismissed this memorandum because of evidence that PCS had telexed two customers with its price list during the day of January 8. The court inferred that Canpotex could have been referring to the PCS "list," which could have been disclosed by the customers. 954 F. Supp. at 1366. However, the class contends that the record shows those telexes were transmitted after the close of business on Friday, January 8, and therefore are unlikely to have wound their way back to Canpotex in time to form the basis for the Canpotex memorandum. Defendants do not dispute that the telexes were transmitted late on January 8, but they suggest that the Canpotex memorandum can be explained by the hypothesis that someone from PCS could have told a customer of the price increase earlier in the day. They cite no evidence to support this theory. Defendants also argue the plural word "lists" actually meant "PCS's list" and therefore only showed knowledge about one defendants' action. Again, the mere possibility of an innocent explanation for evidence that tends to show conspiracy does not entitle defendants to summary judgment.

# IV.

As we understand our previous cases, it is still necessary to take into account the defendants' explanation of their conduct in order to ascertain whether their theory deprives the plaintiffs' case of its probative value.  See Corner Pocket, 123 F.3d at 1112; Lovett v. General Motors Corp., 998 F.2d 575, 580-81 (8th Cir. 1993), cert. denied, 510 U.S. 1113 (1994).  In this case, the defendants' theory is that the price rises are explained entirely by the suspension agreement and the spectre of Saskatchewan prorationing legislation.  In light of the evidence adduced by Prof. Rausser and the Commerce Department correspondence indicating that the industry price far exceeded the price floors set by the suspension agreement, we cannot see that this explanation deflates the class's price fixing theory.  We fully understand that the defendants dispute Rausser's understanding of the suspension agreement price levels.  However, defendants make no attempt to identify a price floor required by the suspension agreement or to show that the defendants actually set their price, for instance the January 11 price of $86.00 for granular grade, by reference to the suspension agreement floor.  Indeed, their expert William Barringer argues that it was actually impossible to ascertain what price would satisfy the agreement.  Instead, the defendants' expert Andrew Rosenfield opined that the defendants needed only to set their prices "well above" suspension agreement floor prices.  Under this theory, the suspension agreement did not dictate the actual prices charged; therefore, the existence of the suspension agreement does not preclude the class's theory that the actual price was set by illegal collusion.

We therefore reverse the district court's entry of summary judgment, except as against Noranda, NMPC/Eddy, and PPG, each of which raises convincing individual arguments, which we discuss in section V, infra.

## V.

Among the defendants, Noranda presents a special case, since there is no evidence that Noranda participated in supplying price information to other defendants. There is slight evidence linking Noranda generally to the exchange of price information, since PCS's Bill Doyle testified that Noranda personnel called him once or twice to ask about prices. Doyle recalled only one conversation, in which he told the Noranda employee that the price that had been reported to Noranda was inaccurate. However, there is no evidence that Noranda acted against its ostensible interest by giving price information to competitors, as opposed to asking the competitors for information; in the absence of such evidence there is simply not a submissible case against Noranda. We therefore affirm the district court's entry of summary judgment for Noranda.

Plaintiffs' evidence against NMPC/Eddy also lacks a key ingredient--a showing of parallel pricing. Not being subject to the Department of Commerce dumping action, these two affiliated American defendants did not announce the $35 increase in September 1987. Instead, on September 15, 1987, NMPC announced a two-step increase: a $13.50 immediate increase, which would be followed by a $10 additional increase effective January 1, 1988. According to the class, this put NMPC at the same prices in January that the Canadians posted in January after entering the suspension agreement.

The whole premise of the class's case is parallel pricing. Without parallel pricing, their case collapses. See In re Baby Food Antitrust Litigation, 166 F.3d at 128-32; Krehl v. Baskin Robbins Ice Cream Co., 664 F.2d 1348, 1357 (9th Cir. 1982); Meat Price Investigators Ass'n v. Iowa Beef Processors, Inc. (In re Beef Industry Antitrust Litigation), 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendant's actions were parallel").

The time gap and the number of important events (such as settlement of the Department of Commerce proceedings) between the Americans' action in September 1987 and the Canadians' post-suspension agreement action in January 1988 defeats any inference that those actions were parallel. The class further argues that after January 1988 the American defendants refrained from competing on price. However, the class's proffered evidentiary support for this argument is quite inadequate. In fact, NMPC increased its market share dramatically during this period. 954 F. Supp. at 1365. The evidence against NMPC/Eddy cannot survive summary judgment.

PPG Industries, Inc. and PPG Canada, Ltd., whom we will refer to jointly as "PPG," argue that the district court entered judgment for it on the alternative ground that its suit was barred by the statute of limitations. PPG points out that the class failed to appeal this ruling, since it did not raise the limitations issue in its opening brief. PPG filed a motion to dismiss this appeal on this same theory, which motion was denied without opinion by another panel. The plaintiffs contend that the magistrate judge did not dispose of the statute of limitations question. However, we conclude that he did reach that issue as to PPG, see 954 F. Supp. at 1390-91, and that the district court's order accepted his recommendation that the suit against PPG was time-barred. At any rate, the plaintiffs' contention of tolling based on fraudulent concealment by PPG has no adequate basis in the record, and PPG is entitled to summary judgment.

We therefore affirm the summary judgment against Noranda, NMPC and Eddy, and PPG, and reverse the judgment of the district court and remand for further proceedings as to all other appellees.

BEAM, Circuit Judge, dissenting.

In this Sherman Act case, the court applies its own brand of market-place justice through the use of a newly minted, but flawed summary judgment standard. In so doing, the court disregards well-established Supreme Court precedent, ignores the well-defined law of this circuit and wrongly applies portions of an inapposite Supreme Court opinion. I dissent.

## I.    BACKGROUND

This dispute involves the production and sale of potash, a mineral essential to plant growth and therefore used in fertilizer. I will not attempt to restate the exhaustive evidence thoroughly discussed by the magistrate judge, but will merely summarize the relevant facts and restate specific evidence as reasonably necessary for a rational discussion of the issues.

Both parties, and the court, agree that the North American potash industry is an oligopoly.[18] Prices in an oligopolistic market tend to be higher than those in a purely competitive market, and will fluctuate independently of supply and demand. See Enrico Adriano Raffaelli, Oligopolies and Antitrust Law, 19 Fordham Int'l. L. J. 915, 916 (1996). Furthermore, "price uniformity is normal in a market with few sellers and homogeneous products." E.I. Du Pont De Nemours & Co. v. Federal Trade Comm'n, 729 F.2d 128, 139 (2d Cir. 1984). This is because all producers in an oligopoly must charge roughly the same price or risk losing market share.

The Canadian province of Saskatchewan is the source of most potash consumed in the United States. The Potash Corporation of Saskatchewan (PCS), founded by the province and a defendant in this litigation, holds thirty-eight percent of the North

---

[18]An oligopoly is an "[e]conomic condition where only a few companies sell substantially similar or standardized products." Black's Law Dictionary 1086 (6th ed. 1990).

American potash production capacity. As a governmental enterprise, PCS had no mandate to maximize profits and was not accountable to private owners. Instead, the company was primarily concerned with maintaining employment and generating money for the local economy. Not surprisingly, PCS endured huge losses as it mined potash in quantities that far outstripped global demand. These policies impacted the entire potash industry: during the 1980's, the price of potash fell to an historic low. In 1986, Saskatchewan voters elected a provincial government which had promised to privatize PCS. New management was appointed to PCS after the elections. Thereafter, PCS significantly reduced its output and raised its prices.

Also in 1986, New Mexico Potash Corporation (NMPC) and another American potash producer (who is not a named defendant) filed a complaint with the United States Department of Commerce. Frustrated with low potash prices, the petitioners alleged that Canadian producers had been dumping their product in the United States at prices below fair market value. In 1987, the Department issued a preliminary determination that the Canadian producers were dumping potash and ordered the companies to post bonds on all exports to the United States. These bonds were set according to each firm's calculated "dumping margin." Eventually, the Department negotiated a Suspension Agreement with each of the Canadian producers. The agreement raised the price of Canadian potash in the United States by setting a minimum price at which each Canadian producer could sell in this country.[19] This agreement remains in effect today. When the Canadian producers entered into the Suspension Agreement, PCS announced that it was raising its prices by eighteen dollars per ton. Other producers quickly approximated the higher price. The price of potash has remained markedly higher after the Suspension Agreement.

---

[19]Under the agreement, each firm could sell potash in the United States at less than fair market value by an amount equal to 15% of its preliminary dumping margin.

The class alleges that between April 1987 and July 1994 the named defendants[20] (collectively, "the producers") colluded to increase and stabilize the price of potash in violation of section 1 of the Sherman Act. The class proceeds under the price fixing theory of conscious parallelism. The producers, in turn, maintain that prices were the product of the interdependent nature of the industry and its reaction to significant external forces. The district court granted the producers' motions for summary judgment and the class appeals.

## II. DISCUSSION

The class asserts that if we affirm the district court, we will "stand alone in holding that circumstantial evidence, even if overwhelming, cannot be used to defeat a summary judgment motion in anti-trust cases." We would make no such legal history here, however, because the class's proffered evidence, far from overwhelming, fails to establish the elements of a prima facie case. The court reverses the district court but in the process makes two critical errors: (1) it incorrectly states the standard for summary judgment and (2) it incorrectly applies the standard.

### A. Summary Judgment Standard

---

[20]The class named six Canadian potash producers: (1) Potash Corporation of Saskatchewan, Inc. and Potash Corporation of Saskatchewan Sales, Ltd. (collectively "PCS"); (2) Cominco, Ltd. and Cominco American, Inc. (collectively "Cominco"); (3) IMC Global, Inc.; (4) Kalium Chemicals, Ltd., Kalium Canada, Ltd. and its former owner and operator, PPG Industries, Inc. and PPG Canada, Ltd. (collectively "Kalium"); (5) Noranda Mineral, Inc., Noranda Sales Corporation Ltd. and Central Canada Potash Co. (collectively "Noranda"); and (6) Potash Corporation of America, Inc. and its owner Rio Algom, Ltd. (collectively "PCA"). The American potash producers named as defendants are New Mexico Potash Corporation (NMPC) and its affiliate Eddy Potash Inc. (Eddy).

The Supreme Court in <u>Monsanto Co. v. Spray-Rite Service Corp.</u>, 465 U.S. 752, 764 & 768 (1984) and <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986), provided the standard used to determine whether the plaintiffs' evidence of a section 1 violation survives a summary judgment motion. We are among the majority of circuits to apply <u>Monsanto</u> and <u>Matsushita</u> broadly in section 1 price fixing cases such as the one before us. See <u>Corner Pocket of Sioux Falls, Inc. v. Video Lottery Tech., Inc.</u>, 123 F.3d 1107, 1109 (8th Cir. 1997), <u>cert. denied</u>, 118 S. Ct. 1054 (1998). In order to withstand summary judgment, plaintiffs must present evidence that "tends to exclude the possibility of independent action" by the defendants. <u>Monsanto</u>, 465 U.S. at 764 & 768. This means that conduct that is "as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." <u>Matsushita</u>, 475 U.S. at 588. Applied in this case, the standard requires that from the evidence, if it is as reasonable to infer a price-fixing conspiracy as it is to infer permissible activity, then the plaintiffs' claim, without more, fails on summary judgment.

The court, although reciting the <u>Monsanto</u> and <u>Matsushita</u> rule, disregards this clear standard by repeatedly citing from <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 451 (1992), a wholly inapposite case. <u>Eastman Kodak</u> was not concerned with the sufficiency of evidence of conspiratorial acts, as we are here, but rather with whether Eastman Kodak possessed market power sufficient to be guilty of "tying."[21] <u>Id.</u> at 455 & 459. <u>Eastman Kodak</u> presented a unique factual situation totally distinct from the evidentiary underpinnings of this litigation.

---

[21]A classic tie-in occurs when a seller conditions the sale of product A on purchase of product B. Tying arrangements violate section 1 of the Sherman Act if the seller (Eastman Kodak) has appreciable market power in the tying product and if the arrangement affects a substantial volume of commerce in the tied product. <u>Eastman Kodak</u>, 504 U.S. at 461-62.

The misuse of Eastman Kodak, and the damaging impact such misuse had on the court's view of the summary judgment standard is clearly evident. The court, for instance, quotes Eastman Kodak as stating, "'Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision.'" Ante at 12 (quoting Eastman Kodak, 504 U.S. at 468). This quotation, of course, is misleading since any reasonable inference must still tend to exclude the possibility of independent action. Similarly, the court later states "[u]nder Eastman-Kodak it is enough if the plaintiff's inference is reasonable." Ante at 27 (concluding that if the inference of conspiracy is reasonable, the class is entitled to the benefit of it). In view of the court's mistaken approach, it cannot be overemphasized that the Supreme Court has rejected this particular summary judgment test and has clearly heightened the standard–the evidence must, as indicated, tend to exclude the "possibility" of independent action.

Interestingly, the court's discussion draws near the proper standard but then, inexplicably, proceeds with an analysis that leads it far astray. Proper analysis demonstrates that the court has not adhered to the controlling precedent of Monsanto and Matsushita especially as this precedent has been broadly construed by this circuit in Corner Pocket.

## B. Applying the Standard

The class's price-fixing claim is based on a theory of conscious parallelism. Conscious parallelism is the process "not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993). The class and the court point out that the producers' prices were roughly equivalent during the alleged conspiracy, despite differing production costs. They

further note that price changes by one producer were quickly met by the others. This establishes only that the producers consciously paralleled each other's prices.

Evidence that a business consciously met the pricing of its competitors does not prove a violation of the antitrust laws. See Theatre Enter., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540-41 (1954). Particularly when the product in question is fungible, as potash is, courts have given parallel pricing little probative weight. See Bendix Corp. v. Balax, Inc., 471 F.2d 149, 160 (7th Cir. 1972). Even the court concedes that "parallel pricing [is] almost inevitable" in a market situation such as this. Ante at 14. An agreement is properly inferred from conscious parallelism only when certain "plus factors" exist. See In re Baby Food Antitrust Litigation, 166 F.3d 112, 122 (3d Cir. 1999); see, e.g., Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 884 (8th Cir. 1978) (requiring evidence that defendant acted contrary to self-interest in addition to evidence of conscious parallelism to establish antitrust violation). A plus factor refers to "'the additional facts or factors required to be proved as a prerequisite to finding that parallel [price] action amounts to a conspiracy.'" In re Baby Food, 166 F.3d at 122 (quoting 6 Phillip E. Areeda, Antitrust Law § 1433(e) (1986)).

The plaintiff has the burden to present evidence of consciously paralleled pricing *supplemented with* one or more plus factors. See Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). However, even after carrying the initial burden, a court must still conclude, based upon all the evidence before it, that the plaintiff's evidence tends to exclude the possibility of independent action. See Monsanto, 465 U.S. at 764 & 768; Matsushita, 475 U.S. at 588; see also In re Baby Food, 166 F.3d at 122. As noted, the class identified parallel pricing. The class also asserts several possible plus factors. The court rejects all[22] but one, concluding that

---

[22]The court extensively reviews the class's allegations that motive to conspire, opportunity to conspire, solicitation, a high level of interfirm communications, and

"we believe the evidence of price verification communications among competitors" constitutes a sufficient plus factor. <u>Ante</u> at 18-19.

In my view, the class's price verification evidence is far too ambiguous to constitute a plus factor that supports an inference of conspiracy. <u>Cf.</u> <u>Corner Pocket</u>, 123 F.3d at 1112 (finding a letter to be too ambiguous to help the plaintiffs defeat summary judgment). In any event, considering the evidence as a whole, the price verification evidence does not tend to exclude the possibility of independent action, as required under <u>Monsanto</u> and <u>Matsushita</u>, since other significant events strongly suggest independent action. The fundamental difficulty with the class's argument regarding price verifications is that it assumes a conspiracy first, and then sets out to "prove" it. And the court has apparently adopted this approach. However, a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly.

The class's evidence shows that possibly several dozen price verifications occurred between employees, including high-level sales employees, of different companies,[23] over at least a seven-year period. These contacts involved the

---

certain alleged actions against self-interest constitute plus factors. These are all either completely rejected or given insignificant weight as "background facts, which . . . do not suffice to prove a conspiracy." <u>Ante</u> at 15. For example, the class asserts evidence that the producers acted against their self-interests by participating in the Suspension Agreement. <u>See, e.g.</u>, <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.</u>, 998 F.2d 1224, 1243-45 (3d Cir. 1993) (denying defendants' motion for summary judgment where defendants refrained from bidding aggressively on accounts already serviced by other defendants). The court summarily rejected this contention. <u>Ante</u> at 18 n.12. Thus, the information is generally gratuitous and irrelevant.

[23]It is noteworthy that the court cites price communications involving defendant companies that it subsequently finds not to have participated in the alleged conspiracy (Noranda and NMPC/Eddy). <u>See, e.g.</u>, <u>Ante</u> at 20 & 29-30.

verification of *"prices they had charged on particular sales."* <u>Ante</u> at 19 (emphasis added).  The downfall of this circumstantial evidence of an agreement to fix prices is that it bears no relationship to the price increases most in question because it lacks the logical link necessary to infer such a relationship.

The class alleges that the price-fixing conspiracy began "at least as early as April, 1987."  Complaint at 11.  In 1987, the price for potash was at historically low levels, such that producers were losing millions of dollars.  Then, a sudden and dramatic increase in price by PCS occurred on September 4, 1987, and approximately a week later the remaining producers followed suit.[24]  The class and the court argue that the large and parallel price rises which were nearly simultaneous combine with the price verifications to create an inference sufficient to survive summary judgment.

The problem with this theory is that the price verification evidence only applied to prices already charged on particular sales, not to future broad market prices.  The court overlooks a critical causal link in this: there is no evidence to support the inference that the price verifications had an impact on price increases.  The only evidence is that prices were possibly cut as a result.  "[T]o survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions."  <u>In re Baby Food</u>, 166 F.3d at 125 (citing <u>Krehl v. Baskin-Robbins Ice Cream Co.</u>, 664 F.2d 1348, 1357 (9th Cir. 1982)).  There is no evidence here that price increases resulted from any price verification or any particular communication of any kind.  How can subsequent price verification evidence on particular sales support a conspiracy for the setting of a broad market price on September 4, 1987?  It cannot.

---

[24]This price increase was rescinded in the wake of the Suspension Agreement. In its place came a much smaller increase on January 11, 1988 by PCS–three days after the Suspension Agreement created a price floor–which was followed thereafter by the remaining producers.

Even if we find the price verification evidence relevant, when considered with all the facts, it does not tend to exclude the possibility of independent action. To the contrary, there is strong evidence of independent action. Just before and concurrent with the suspect price increases, the following occurred: the price of potash was at historic lows and the producers were losing millions; potash companies in the United States complained to the United States Department of Commerce that the Canadian producers were dumping potash at well-below market value; the Department of Commerce made a preliminary determination that the Canadian producers were dumping and required expensive bonds for all imports; the industry leader, the government founded PCS, hired new management and began privatization with the goal of becoming profitable; legislation was passed in the province of Saskatchewan–the source of nearly all U.S. potash–that provides for the setting and prorating of potash production; potash producers reached a Suspension Agreement with the Department of Commerce that sets price floors for potash; and PCS was finally privatized and significantly reduced its output. In the face of these circumstances and with the price leadership of PCS in this oligopolistic industry, it would be ridiculous to think that the remaining companies would not also raise their prices in a parallel fashion. The class's weak circumstantial evidence that the dramatic increases were the result of a price-fixing agreement is not sufficient to survive summary judgment. This leaves only the question whether there is sufficient evidence to support an agreement to stabilize and maintain prices in violation of section 1 of the Sherman Act.

The court's evidence of an agreement to maintain the price of potash at an artificially high level after the initial price increases is again the parallel pricing and price verifications. Parallel pricing is conceded, leaving the burden once again on the price verifications. It is common sense to think that a conspiracy to fix a price involves a company that communicates with another company before the price quotation to the customer. Here, in every instance, we have communications to verify

a price on a completed sale. To escape this logical conclusion, the court makes several unconvincing arguments.

The court points to a statement by one witness, that he made verification calls in part to see if he could "[m]eet a competitive price if that opportunity was available." Ante at 22. This sounds strangely like competition since the participants are lowering prices to compete. In response to this argument, the court contends that although in the short-term the prices are lowered, the long-term effect is to maintain artificially high prices.[25] However, the class's own evidence establishes that there was a continual decline in the price for potash over the years in question. Appellants' Appendix at 1422-29.

Further detrimental to the court's theory are its own statements that companies seldom received the listed price for the product and "continued to undercut each other in privately negotiated deals." Ante at 19. I suppose that the court is arguing, without evidence one way or the other, that the slow decline in price was not a fast enough decline. This seems to be getting into the very ambiguous and speculative territory the Supreme Court has sought to avoid in section 1 claims. See Monsanto, 465 U.S. at 762-64; Matsushita, 475 U.S. at 594. The Supreme Court has held that when circumstantial evidence is ambiguous, summary judgment should be granted to the defendants. See Monsanto, 465 U.S. at 763-64.

---

[25]The Supreme Court has also noted that:

The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.

United States v. United States Gypsum Co., 438 U.S. 422, 441 n.16 (1978).

The price verifications relied upon were also sporadic and testimony suggests that price verifications were not always given. The fact that there were several dozen communications is not so significant considering the communications occurred over at least a seven-year period, a period in which there may have been tens of thousands of transactions. Furthermore, you would expect companies to verify prices considering this is an oligopoly and accounts are very large. These facts further undermine the already speculative assertions of the court. The evidence falls far short of excluding the possibility of independent action.

A recent case that demonstrates the frailty of the court's analysis is In re Baby Food Antitrust Litigation, 166 F.3d 112 (3d Cir. 1999). The defendants, nationally prominent corporations with 98% of the baby food business, were Gerber, H.J. Heinz, and Beech-Nut. The numerous intercompany pricing communications found by the Third Circuit to be insufficient to support a section 1 violation are tersely dismissed by the court as "price discussions among low level employees." Ante at 20. However, the deposition testimony revealed that district sales employees and district sales managers of Heinz, one of the alleged conspirators, "were required to submit competitive activity reports to their superiors concerning baby food sales from information they picked up from competitor sales representatives." In re Baby Food, 166 F.3d at 118-19. This same line of testimony revealed that supervising managers for Heinz informed district managers "on a regular basis before any announcement to the trade as to when Heinz's competitors were going to increase [their] wholesale list prices." Id. at 119. The president of Beech-Nut, another alleged conspirator, "testified that it was [Beech-Nut's] policy for sales representatives to gather *and report* pricing information of [Beech-Nut's] competitors." Id. (emphasis added). Indeed, the In re Baby Food case is replete with evidence that pricing information was systematically obtained and directed to high-level executives of Gerber (including Gerber's vice president of sales), Beech-nut and Heinz, the principal national competitors in the baby food industry. So, for the court to disregard the holding in In re Baby Food because "'[n]o evidence . . . shows that any executive of any defendant [Gerber,

Beech-Nut and Heinz] exchanged price or market information *with any other executive*,'" Ante at 20 (quoting In re Baby Food, 166 F.3d at 135) (emphasis added), is to blithely ignore the fact that a carefully conceived and effective system of price information gathering for the benefit of corporate executives was at all relevant times alive and well in the baby food industry.[26]

Notwithstanding communications that far surpassed any information exchanges established in this case, the Third Circuit correctly applied Matsushita and granted summary judgment to the defendants. In doing so, the Third Circuit aptly noted that "to survive summary judgment [on the basis of exchanged pricing information] there

---

[26]In its footnote 14, the court purports to find a difference in price discussions where one purported conspirator gathers information and another purported conspirator gives the information. This difficult to understand argument makes nothing more than a distinction without a difference, especially here where there is clearly no evidence connecting any price discussions with the fixing, increasing or maintaining of a price level. See In re Baby Food, 166 F.3d at 125. The only evidence is to the contrary and dramatizes the court's flawed reasoning. When price verifications were made, there was no evidence that the companies increased prices or even held the line on prices. Instead, the court itself depicts producers cutting prices in response to confirmed price cuts by another producer on a particular sale. In one instance, the producer who verified a price was then underbid and lost the order. Ante at 22-23. It is difficult to understand the reasoning that, on this evidence, transforms this from an obviously competitive market to a collusive agreement to fix prices. What the court has done, contrary to its own admonition, is view the price verifications in isolation without considering their actual results or attempting to make a connection with the fixing of prices. See Ante at 12 ("In applying the Monsanto standard, we must view the evidence as a whole, rather than asking whether each item of evidence viewed in isolation meets the standard." (citing In re Workers' Compensation Ins. Antitrust Lit., 867 F.2d 1552, 1563 (8th Cir. 1989); City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 565 (11th Cir. 1998); Apex Oil Co. v. DiMauro, 822 F.2d 246, 254-55 (2d Cir. 1987))).

must be evidence that the exchanges of information had an impact on pricing decisions." In re Baby Food, 166 F.3d at 125 (citing Krehl, 664 F.2d at 1357). As earlier stated, there is absolutely no such evidence in this litigation, only speculation.

Finally, the class argues, in a last ditch effort, that its expert's econometric model provided crucial confirmation that the prevailing potash prices during the alleged conspiracy were above those expected in the absence of collusion. Cf. Id. (rejecting a similar argument). We need not decide whether such evidence, in a proper case, could constitute a plus factor, because the report in this case is not probative of collusion.

The class's expert evidence is lacking in two crucial respects. First, the expert admits that his model fails to take into account the dramatic events surrounding the price increases: namely the privatization of PCS and the anti-dumping proceedings. Second, the expert's report, as the magistrate judge noted, relies almost exclusively on evidence (such as the producers' common membership in trade associations and their publication of price lists to customers) that is not probative of collusion as a matter of law. The expert's model is fundamentally unreliable because of heavy (if not exclusive) reliance on evidence that is not probative of conspiracy, coupled with his failure to consider significant external forces that unquestionably served to raise the price of potash. See Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988).

## III. CONCLUSION

The class has failed to present evidence of collusion sufficient to preclude summary judgment under Monsanto and Matsushita. The producers are therefore entitled to summary judgment. For the foregoing reasons, the decision of the district court should be affirmed. I dissent from the court's holding to the contrary.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.